# IN THE UNITED STATES DISTRICT COURT FOR
# THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| D. H. PACE COMPANY, INC., d/b/a Overhead Door Company of Atlanta, | CIVIL ACTION NO. 1:17-cv-03430-MHC |
| Plaintiff, | DEMAND FOR JURY TRIAL |
| v. | |
| AARON OVERHEAD DOOR ATLANTA LLC, JEREMY RYAN LUCIA, and STEPHENIE LUCIA, | |
| Defendants. | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF
## MOTION TO EXCLUDE PUTATIVE EXPERT ROBERT LEONARD

This 26th day of March, 2020.

Respectfully submitted,

KENDALL | MANDELL, LLC

3152 Golf Ridge Blvd., Suite 201
Douglasville, Georgia 30135
Telephone:  (770) 577-3559
Facsimile:   (770) 577-8113
mckendall@kendallmandell.com
srmandell@kendallmandell.com

MEUNIER CARLIN & CURFMAN LLC
999 Peachtree Street, NE, Ste. 1300
Atlanta, Georgia 30309
Telephone:  (404) 645-7700
Facsimile:   (404) 645-7707
lpavento@mcciplaw.com

 /s/ Samantha R. Mandell
Michael C. Kendall
Georgia Bar No. 414030
Samantha R. Mandell
Georgia Bar No. 141689

Lisa C. Pavento
Georgia Bar No. 246698
*Counsel for Defendants*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................... i

INDEX TO EVIDENTIARY APPENDIX ........................................... vi

I.    BACKGROUND ....................................................................... 1

    A.    Overview of Plaintiff's Claims ......................................... 1

    B.    Pace's Partial Motion for Summary Judgment ................... 1

    C.    Robert Leonard's Prior Engagements ................................. 2

    D.    Leonard's Proposed Opinions In This Case........................ 6

II.   ARGUMENT............................................................................ 14

    A.    Leonard Is Not Qualified To Offer His Proposed Opinions. ............ 14

    B.    Leonard's Factual Foundation Is Insufficient And Unreliable. ........ 16

    C.    Leonard's "Methodology" Is Unreliable........................................ 20

        1.    Leonard's Case Specific Approach Is Unreliable.................. 20

        2.    Leonard's Approach Fails All of *Daubert's* Guideposts........ 24

    D.    Leonard's Proposed Opinions Are Irrelevant And Lack "Fit." ........ 31

        1.    Leonard's Definitional Framework Is Legally-Erroneous . ... 31

        2.    Leonard Failed To Evaluate Consumer Perception. ............... 34

# TABLE OF AUTHORITIES

## Cases

*A.J. Canfield Co. v. Honickman,*
  808 F.2d 291, (3d Cir. 1986) ...........................................................33

*Abercrombie & Fitch Co. v. Hunting World, Inc.,*
  537 F.2d 4, (2d Cir. 1976) ..............................................................32

*Acad. of Motion Pictures Arts & Scis. v. Godaddy.com, Inc.,*
  CV 10-3738 ABC (CWx), 2013 U.S. Dist. LEXIS 198591,
  (C.D. Cal. June 21, 2013) .......................................................... 33-34

*Allgood v. Gen. Motors Corp.,*
  2006 U.S. Dist. LEXIS 70764, (D. Ind. 2006) ...............................16

*Am. Gen. Life & Accident Ins. Co. v. Ward,*
  530 F. Supp. 2d 1306, (N.D. Ga. 2008) .........................................26

*Ankuda v. R.N. Fish & Son, Inc.,*
  535 F. Supp. 2d 170 (D. Me. 2008) ...............................................25

*Apple Inc v. Amazon.com, Inc.,*
  CV 11-01327 (N.D. Cal. 2011) ...............................................passim

*Barber v. United Airlines,*
  17 Fed. App'x 433 (7th Cir. 2001) ................................................16

*Birge v. Dollar Gen. Corp.,*
  No. 04-2531 B/P, 2006 U.S. Dist. LEXIS 97195
  (W.D. Tenn. Sept. 29, 2006) ..................................................... 24-25

*Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.,*
  582 F.3d 1227 (11th Cir. 2009) .....................................................14

*Bowers v. Norfolk S. Corp.,*
  537 F. Supp. 2d 1343 (M.D. Ga. 2007) ..................................... 14-15

*Burkhart v. Wash. Metro. Area Transit Auth*.,
   112 F.3d 1207 (D.C. Cir. 1997) .............................................................Motion

*Crowley v. Chait*,
   322 F. Supp. 2d 530 (D.N.J. 2004) ...................................................................16

*CRST Van Expedited, Inc. v. J.B. Hunt Transport, Inc.*,
   No. CIV-04-0651-F, 2006 WL 2054646 (W.D. Okla. July 24, 2006) ............31

*Daubert v. Merrell Dow Pharms*.,
   509 U.S. 579 (1993) ...............................................................................passim

*Deckers Outdoor Corp. v. Australian Leather Pty Ltd*.,
   340 F. Supp. 3d 706 (N.D. Ill. 2008) ........................................................ 26-27

*Feinberg v. Katz,*
   2007 U.S. Dist. LEXIS 94967 (S.D.N.Y. 2007) .............................................34

*Firefly Digital Inc. v. Google Inc*.,
   817 F. Supp. 2d 846 (W.D. La. 2011)..............................................................23

*FN Herstal, S.A. v. Clyde Armory, Inc*.,
   No. 3:12-CV-102, 2015 U.S. Dist. LEXIS 4310
   (M.D. Ga. Jan. 8, 2015) ........................................................................... 34-35

*Gen. Elec. Co. v. Joiner*,
   522 U.S. 136 (1997) ..................................................................................24, 27

*In re Apollo Group Inc. Sec. Litig.*,
   527 F. Supp. 2d 957 (D. Ariz. 2007) ........................................................20, 31

*In re Bextra & Celebrex Mktg. Sales Practices & Prod Liab. Litig,*
   524 F. Supp. 2d 1166 (N.D. Cal. 2007) .................................................... 30-31

*In re Nellson Nutraceutical, Inc*.,
   356 B.R. 364 (Bankr. D. Del. 2006) ........................................................ 20-21

*J & J Snack Foods Corp. v. Earthgrains Co.*,
   220 F. Supp. 2d 358 (D.N.J. 2002).....................................................................33

*James River Ins. Co. v. Rapid Funding, LLC*,
   No. 07-cv-01146-CMA, 2009 U.S. Dist. LEXIS 14199
   (D. Colo. Feb. 24, 2009) .................................................................... 16, 19-20

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999) ........................................................................................14

*Lake Mich. Contractors, Inc. v. Manitowoc Co.*,
   225 F. Supp. 2d 791 (W.D. Mich. 2002) ...................................................21, 26

*Lantec, Inc. v. Novell, Inc.*,
   2001 U.S. Dist. LEXIS 24816 (D. Utah 2001) .................................................23

*Lava Trading, Inc. v. Hartford Fire Ins. Co.*,
   2005 U.S. Dist. LEXIS 4566 (S.D.N.Y. 2005) ......................................... 23-24

*Loctite Corp. v. National Starch & Chem. Co.*,
   516 F. Supp. 190 (S.D.N.Y. 1981) ........................................................... 31-32

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
   209 F. Supp. 3d 612 (S.D.N.Y. 2016) ...........................................................26

*Lyman v. St. Jude Med., Inc.*,
   2008 U.S. Dist. LEXIS 42015 (E.D. Wisc. 2008) ..................................... 16-17

*Magic Wand, Inc. v. RDB, Inc.*,
   940 F.2d 638 (Fed. Cir. 1991) .......................................................................35

*Martinez v. Rabbit Tanaka Corp.*,
   2006 U.S. Dist. LEXIS 97084 (S.D. Fla. 2006) .............................................15

*Microsoft Corp. v. Apple, Inc*,
   Opposition No. 91195582 (U.S. Patent and Trademark Office
   (*In re Application Serial No. 77525, 43*) ...................................................passim

*Microstrategy Inc. v. Business Objects Americas, Inc.*,
  429 F.3d 1344 (Fed. Cir. 2005) .........................................................................16

*Munoz v. Orr*,
  200 F.3d 291 (5th Cir. 2000) ............................................................................23

*Pinal Creek Group v. Newmont Mining Corp.*,
  352 F. Supp. 2d 1037 (D. Ariz. 2005) ....................................................Motion

*PODS Enters. v. U-Haul Int'l, Inc.*,
  No. 8:12-cv-01479-T-27MAP, 2015 U.S. Dist. LEXIS 29849
  (M.D. Fla. Mar. 11, 2015) ................................................................................34

*PODS, Inc. v. U-Haul, Int'l, Inc.*,
  No. 8:12-cv-01479, 2014 U.S. Dist. LEXIS 193895
  (M.D. Fla. June 26, 2014) .........................................................................passim

*S. S. Kresge Co. v. United Factory Outlet, Inc.*,
  598 F.2d 694 (1st Cir. 1979) ......................................................................32, 35

*San Diego Comic Convention v. Dan Farr Prods.*,
  Case No. 14-cv-1865, 2017 U.S. Dist. LEXIS 147574
  (S.D. Cal. Sept. 12, 2017) ........................................................... 20, 24, 39-30, 35

*SEC v. Pasternak,*
  2008 U.S. Dist. LEXIS 42460 (D.N.J. 2008) ........................................... 15-16

*Stein v. Pacific Bell*,
  No. C 00-2915 SI, 2007 U.S. Dist. LEXIS 19193
  (N.D. Cal. Mar. 19, 2007) ...............................................................................24

*Ty, Inc. v. Softbelly's, Inc.*,
  No. 00 C 5230, 2006 U.S. Dist. LEXIS 100736 (N.D. Ill. Apr. 7, 2016) .......30

*United Co. v. Keenan*,
  2007 U.S. Dist. LEXIS 88049 (W.D. Va. 2007) .............................................23

*United States v. Fleet Mgmt. Ltd.*,
    2008 U.S. Dist. LEXIS 34970 (E.D. Pa. 2008) ................................................21

*United States v. Frazier*,
    387 F.3d 1244 (11th Cir. 2004) ...............................................................14, 20

*Welding Servs. v. Forman*,
    509 F.3d 1351 (11th Cit. 1007) ..........................................................23, 28, 31

*Wilson v. Woods*,
    163 F.3d 935 (5th Cir. 1999) ...........................................................................15


**Statutes**
15 U.S.C. § 1064(3) ........................................................................................ 30, 34

**Federal Rules**
Federal Rule of Evidence 702 ............................................................................ 14

Federal Rule of Evidence 703 ............................................................................ 17

**Other**
Federal Rule of Evidence 702 advisory committee note ..................................... 24

## INDEX TO EVIDENTIARY APPENDIX

*References herein to "Ex. __" correspond to the exhibits listed below*

**Exhibit A**    8/28/2018 Deposition of Robert A. Leonard ("Leonard Deposition")

**Exhibit B**    8/10/2018 Report of Robert A. Leonard

**Exhibit C**    Exhibit 4 to Leonard Deposition – Municipal Ordinance from Fayette County, Georgia

**Exhibit D**    Exhibit 5 to Leonard Deposition – Municipal Ordinance from Columbia County, Georgia

**Exhibit E**    Exhibit 6 to Leonard Deposition – Communications between Leonard and Plaintiff's counsel

**Exhibit F**    Exhibit 7 to Leonard Deposition – Dr. Robert Leonard's Responses and Objections to Defendants' Subpoena to Produce Documents ("Leonard's Subpoena Response")

**Exhibit G**    Exhibit 9 to Leonard Deposition – Composite exhibit of record material provided to Leonard by counsel and identified in Paragraph 5 of Leonard's Subpoena Response

**Exhibit H**    Exhibit 10 to Leonard Deposition – OSHA website

**Exhibit I**    Exhibit 11 to Leonard Deposition – Article from The Advisor

**Exhibit J**    Exhibit 12 to Leonard Deposition – Overhead Door Manual

**Exhibit K**    Exhibit 13 to Leonard Deposition – Excerpt from website of the Institute of Door Dealer Education and Accreditation ("IDEA")

**Exhibit L**    Exhibit 14 to Leonard Deposition – Excerpt from IDEA website

**Exhibit M**    Exhibit 15 to Leonard Deposition – Wikipedia page for "Garage door"

**Exhibit N**    Exhibit 16 to Leonard Deposition – "History of the Garage door" by Deanne Winterton at www.amazines.com (as exhibited) and a reformatted version of the same article attached

**Exhibit O**    Exhibit 17 to Leonard Deposition – Wikipedia page for "Door"

**Exhibit P**    Exhibit 18 to Leonard Deposition – Louisiana Secretary of State listing

**Exhibit Q**    Exhibit 21 to Leonard Deposition – Oregon Secretary of State listing

**Exhibit R**    1/27/2014 Deposition of Robert Leonard taken in *PODS, Inc. v. U-Haul, Int'l, Inc.*, No. 8:12-cv-01479 (M.D. Fla.) ("*PODS*")

**Exhibit S**    12/2/2013 Report of Robert A. Leonard in *PODS*

**Exhibit T**    3/28/2011 Report of Robert A. Leonard in *Apple Inc. v. Amazon.com, Inc.*, Case No. CV 11-01327 (N.D. Cal.)

**Exhibit U**    Declaration of John Nale filed at ECF No. 90 in *D.H. Pace Company, Inc. v. AOD Group, LLC*, Civil Action No. 1:12-cv-03854 (N.D. Ga.) ("*AOD*")

**Exhibit V**    12/28/2011 Email from C. Henn filed at ECF No. 89-8 in *AOD*

**Exhibit W**    Deposition Exhibit 46 – Dictionary definition "overhead door"

**Exhibit X**    Search results for "overhead door" in Laredo, Texas

**Exhibit Y**    Search results for "overhead door" in Alexandria, Louisiana

**Exhibit Z**    Search results for "overhead door" in Atlanta, Georgia

**Exhibit AA**    Excerpts from 2001-2016 Annual Reports of D.H. Pace and E.E. Newcomer

**Exhibit BB**    August 8, 2012 Overhead Door Corporation Press Release

**Exhibit CC**    2/28/2011 Robert Leonard Declaration in *Microsoft Corp. v. Apple, Inc.*, Opposition No. 91195582, United States Patent and Trademark Office (*In re Application Serial No. 77525, 433*)

**Exhibit DD**    Overhead Door Corporation Product Specification

**Exhibit EE**    USPTO patent search for "overhead door"

## I.     BACKGROUND

### A.     Overview of Plaintiff's Claims[1]

Distributor Agreements entered into between Overhead Door Corporation ("ODC") and Plaintiff D.H. Pace, Inc. ("Pace") "grant[] Pace the right to use . . . the trade name 'Overhead Door Company of Atlanta'" in 31 Georgia counties and "license[] Pace to operate in Atlanta" selling and installing ODC's overhead door products. (Ex. U, ¶ 6; Ex. V; ECF 141-1 at 4-52.) Defendant Aaron Overhead Door Atlanta, LLC ("Aaron") is a residential and commercial door repair and installation company headquartered in Buford, Georgia. Pace challenges Aaron's right to use the tradenames "Aaron Overhead Door(s)" and "Aaron Overhead Door(s) Atlanta," and seeks to prohibit Aaron from, among other things, using the phrases "overhead door(s)" and "overhead garage door(s)" to describe its products and services.

### B.     Pace's Partial Motion for Summary Judgment

Pace sought summary judgment on whether it has protectable rights in the ODC tradename and/or its component parts. (ECF 81.) The first inquiry pertinent to resolving Pace's motion was, "does Pace have any enforceable rights in the ODC tradename 'Overhead Door Company of Atlanta'"? (ECF 132 at 17.) This question, in turn, is itself comprised of two separate inquiries: (1) did Pace carry its burden to show that the terms "overhead door" and "Overhead Door Company of Atlanta" are not generic? and, if so,

---

[1] The facts have been presented extensively to this Court, (ECF 81, 102), and will not be repeated other than as context for Leonard's proposed testimony.

(2) did Pace carry its burden to establish secondary meaning among consumers in the relevant market?

Leonard's proposed testimony speaks only to the first question. In its Order denying Pace's motion, this Court found that Pace "failed to meet its burden to establish that the term 'Overhead Door' is not generic." (*Id.* at 21.) The Court further found that Leonard's proposed testimony was "[t]he **only** evidence presented by Pace to show that 'Overhead Door of Atlanta' is not generic," but that his opinion was "not dispositive, given other indicia that the term may be generic." (*Id.* at 23-24 (emphasis added).)[2]

### C.    Robert Leonard's Prior Engagements

Prior to this case, Leonard was retained to evaluate genericism in connection with two other marks: "PODS" and "App Store." (Exs. S, CC.) The one time his proposed testimony was challenged, it did not clear *Daubert's* gate. *See PODS, Inc. v. U-Haul, Int'l, Inc.*, No. 8:12-cv-01479, 2014 U.S. Dist. LEXIS 193895 (M.D. Fla. June 26, 2014) ("*PODS*"). In *PODS*, Leonard proposed to testify that the term "PODS" was generic (i) prior to its adoption by the plaintiff and (ii) since. (Ex. S.) All of his opinions in the second category were excluded as unreliable. The court held that "Leonard's

---

[2] Noting Pace's failure to come forward with "market surveys, polling, or other quantitative evidence of consumer perception," the Court further concluded that, "[e]ven assuming arguendo that ["Overhead Door Company of Atlanta"] is descriptive," Pace failed to meet its burden to show secondary meaning. (ECF 132 at 26, 28.) Leonard offers nothing probative on this question as he conducted no market study or poll and lacks qualifications to do so. (Ex. A, 316:7-18.)

blind acceptance of and reliance on one-sided data from U-Haul, his failure to apply any analytical methodology whatsoever, and his parroting of the generic definition urged by U-Haul render his post-1998 opinions unreliable and therefore inadmissible." *See id*. at *11. The source of the bulk of the information on which Leonard unscrupulously relied in *PODS* were **the same lawyers that represent Plaintiff here**. *See id*. at *10.

In any event, in *PODS*, Leonard evaluated generic usage of "pods" in, among other places, industry publications, competitor websites, court decisions, USPTO patent filings, online articles, public websites, and internal documents of the party claiming protectable rights. (Ex. B, ¶¶ 34-49, 64-66, 82-83, 118-135.) He found particularly important that many other companies in the relevant industry used "pods" generically and cited to these companies' websites to support his conclusions. (*Id*. ¶¶ 84-98.) He also relied on a nationwide search performed by counsel that identified 6 discrete municipalities with local ordinances in which "pods" was used generically. (*Id*. ¶¶ 108-112, 116.) Because he found evidence of generic usage throughout these sources, Leonard concluded that the evidence was "overwhelming" that "pods" was generic. (*Id*. ¶ 136.)[3]

---

[3] In *PODS*, Leonard also offered convoluted testimony about hypernyms and hyponyms, ultimately concluding that "pods," which was a hyponym for the more-generic hypernym "container," was a generic term and that hypernyms and hyponyms are synonyms for one another. (Ex. R, 323:25-324:23, 326:13-21, 331:18-332:11, 333:17-21, 335:23-342:10.)

In *PODS*, where Leonard was paid to reach an opinion that "pods" was generic, he found it unimportant that some marketplace participants used a term other than "pods" to describe the same goods, explaining that this "***simply shows that there are other way of referring to these terms***" and that it "doesn't mean necessarily that pods is not [generic]." (Ex. R, 290:10-20 (emphasis added(.) In other words, there, Leonard acknowledged that a term can be generic even if it is not the only way – or even if it is not the most common way – to describe a particular product. (*Id*. 282:6-10 ("I'm not saying that the only word in the English language for a [storage container] is pod, but that pod is a generic word to express that concept").)

In *Apple Inc v. Amazon.com, Inc.,* CV 11-01327 (N.D. Cal. 2011), Leonard was retained to analyze whether "App Store" was used as a generic term for an online application marketplace. (Ex. T.) He was also retained by Apple to render similar testimony before the USPTO. (Ex. CC.) Both times, his "focus was on analyzing uses of the term APP STORE in order to determine whether the predominant usage of the term is as a proper noun." (Exs. T, CC, ¶ 15.) He "paid close attention to the capitalization (or lack thereof) of that term in common usage." (*Id*. ¶ 16.) "This is because, in standard English, names considered to represent specific entities . . . are denoted by the use of initial capital letter[.]" (*Id*.) Leonard testified that it was important to look at whether a term is preceded by an indefinite article, such as "a" or "an" because such usage suggests that a term is generic. (*Id.* ¶ 17.) He further testified to the importance of

whether a term was being used generically prior to its incorporation into a particular company's trademark or tradename. (*Id*. ¶¶ 25-26.)

In *Apple*, Leonard ran a search for "app store" in a LexisNexis databank, which he described as "offer[ing] the ability to conduct linguistic research utilizing a vast catalog of content from thousands of global news sources, company and industry intelligence providers, biographical and reference sources and a host of other material." (Exs. T, CC, ¶ 12.) He compared the number of times "app store" referred to Apple's App Store to the number of times references were to something other than Apple. (*Id*. ¶ 30.) Eighty-six percent of the references were Apple-specific. (*Id*.) He also ran a search in the Corpus of Contemporary American English ("COCA") and performed a similar analysis. (*Id*. ¶ 13.) In that database, 88% of the references were to Apple's "App Store" as a proper noun. (*Id*. ¶ 31.) He also searched Google and found that 76% of his results referred to Apple. (*Id*. ¶ 32.) Based on this data, Leonard concluded, "with a high degree of certainty, that the predominant usage of APP STORE is as a proper noun to refer to Apple's online marketplace." (*Id*. ¶ 33.) This was corroborated, by "[t]he fact that Apple's principal competitors do not brand or describe their services by using the term APP STORE." (*Id*. ¶ 35.) The absence of a definition for "App Store" in traditional dictionaries and the presence of Apple-specific definitions of "App Store" in multiple online dictionaries further supported his opinions. (*Id*. ¶¶ 37-41.)

- 5 -

### D.   Leonard's Proposed Opinions In This Case

Eschewing the approach he took in *PODS* and *Apple*, in which generic usage by industry participants, in trade publications and articles, and by the owner of the alleged rights were of paramount importance – and ignoring his methodology of comparing proportional usage as a proper noun to generic usage, searching LexisNexis, and relying on whether definitions of the term at issue are company-specific – Leonard proposes to offer opinions in this case based on a newly-minted, results-driven methodology unguided by any standards or principles.

Here, even though Leonard has described Wikipedia as "the last place that the scholars go," he relied on a Wikipedia entry for "Garage door" to support a conclusion that "overhead door" is non-generic. (*Compare* Ex. B, ¶¶ 43-48, *with* Ex. R, 299:18-300:1.) Meanwhile, ***this single entry <u>itself</u> refers to "overhead" garage doors no fewer than five times***. (Ex. M at 3, 5.) The Wikipedia page also provided references to sources, including to an article entitled "History of the Garage Door." (*Id*. at 7.) Under the heading "Overhead type garage doors," this article notes that evidence of an upward-lifting sectional "overhead door" dates back to at least 1906. (Ex. N at 3.) Leonard did not look at this article, nor did this long-standing use seem to make one iota of difference to him. (Ex. A, 149:16-150:4, 151:1-3.)

Leonard also relied on the Wikipedia entry for "door." (Ex. O.) It contains a statement that, "**[u]p-and-over** or **overhead** doors are often used in garages" and

identifies a **"sectional overhead door"** as one type of overhead garage door. (Ex. O at

12 (emphasis in original).) Based on the fact that "up-and-over" comes before

"overhead" in the quoted language, he concluded that, "being the first term," it is

"presumably the one that is more widely known" even though he lacks knowledge of

any companies in this sector that use "up and over" in their trade names, whereas he is

aware of other companies that use "overhead." (Ex. A, 162:14-25.)

On that note, contrary to his prior methodologies, Leonard did no research as to

whether other companies in Atlanta or anywhere else use "overhead" or "overhead

door" in their business names or to describe their products and services. In fact, his

awareness that companies other than the parties use "overhead" in their tradenames was

limited to seeing the names of three Georgia companies in the course of trying to

support the conclusion that he was paid $20,000 to reach. (Ex. A, 162:23-13, 240:23-

242:14; Ex. B, ¶¶ 48, 78.) He even suggested the entire overhead door industry might be

comprised exclusively of ODC-related companies. (Ex. A, 134:2-135:21.)

Aside from two discrete localities outside of Georgia that Plaintiff's counsel

selected and asked Leonard to look at – Alexandria, Louisiana and Laredo, Texas – he

conducted no investigation as to whether other companies use or have used "overhead"

or "overhead door" in their business names. (Ex. A, 167:20-25; 169:23-171:15, 182:3-

24, 198:25-199:13, 199:21-23.) He saw no reason to explore industry usage because he

deemed sufficient printouts of Pace's advertising provided to him by counsel even

though these advertisements show absolutely nothing about the widespread generic usage of "overhead" and "overhead doors" by other companies nationwide. (Ex. A, 171:2-15; Exs. P & Q; Ex. X.) He baldly declared that it was unimportant if and how other companies use "overhead door" in their names or to describe their products and services and that he did not consider nationwide generic use of "overhead door" to be of any consequence. (Ex. A, 181:16-182:12, 200:7-10.) To Leonard – but not to anyone else (or even to Leonard in his prior engagements) – "all these other companies that are brands with 'overhead door' . . . doesn't make it generic" and brand recognition is unrelated to the genericism inquiry. (Ex. A, 180:9-12, 182:18-34.) He explained that none of this matters by reasoning that, if there are 100 other companies, "there will be 100 lawsuits or maybe there's five more and there will be five lawsuits." (Ex. A, 201:3-5.) In other words, his opinions are predicated on an assumption that all usage must necessarily refer to Plaintiff despite copious evidence otherwise.

After thus assuming his desired conclusion, Leonard ran searches on some home improvement sites for "overhead door" and was directed to reviews of companies providing garage door services. (Ex. A, 307:1-308:7.)[4]  Based on his incorrect belief that

---

[4]  As part of this effort, Leonard found one review referencing "overhead door companies," but he summarily dismissed it and neglected to include with the others that he copied into his report. (Ex. B, ¶ 72.)

there can be only one generic term for a given thing, Leonard concluded that "garage door" was generic and, therefore, "overhead door" is not.

Leonard also relied on COCA, which is a database of words from texts across five genres: spoken, fiction, popular magazines, newspapers, and academic journals.[5] But, unlike what he did in *Apple*, he did not compare proportional usage of "overhead door" as a proper noun to generic usage. This is because such a comparison would yield a conclusion contrary to the one he wants so badly to provide. Specifically, if one replicates Leonard's "research" by searching for "overhead door" on COCA,[6] it yields 28 results, 26 of which reflect generic usage, one of which is a caption on a photo in a 199 issue of Southern Living identifying "Overhead Door Company" as the manufacturer of a product featured in a photo, and the last of which is attribution of a quote to the owner of Pioneer Overhead Door in a 2013 USA Today article. Thus, of the 28 results, only two are non-generic proper nouns, one of which is to a company other than Plaintiff or ODC. To avoid the only reasonable conclusions that could be drawn from this data, Leonard ginned up a new theory by which it became important that there were 31 hits for "overhead door" on COCA whereas there were 786 for the different

---

[5] https://en.wikipedia.org/wiki/Corpus_of_Contemporary_American_English.

[6] Much like how he determines what methodology to employ, Leonard decides whether to preserve his research on a case-by-case basis. Here, he elected not to save any. (Ex. A, 333:19-334:23.) In any event, the above-described search can be reconstructed by typing in "overhead door" at this URL: https://www.english-corpora.org/coca/.

phrase "garage door." (Ex. B, ¶¶ 67-68.) Leonard did not concern himself with the actual ***usage*** of the words "overhead door" in his results, attribute any meaning to the fact that 93% of the references to "overhead door" reflected generic usage as opposed to brand names, or care whatsoever about the fact that only one of the two non-generic uses referred to an ODC distributor (and even then only for a photo credit). (Ex. A, 330:18-332:18.) Instead, he focused on the mere fact that the volume of results for "garage door" exceeded those for "overhead door." This has nothing to do with whether both terms are generic. Indeed, "couch" appears 20,474 times in COCA, whereas "sofa" only shows up 8,682 times, but this does not make one less generic than the other. If there is ***any*** relevant take-away from the COCA data, it is that 93% of the results for "overhead door" reflect generic use of that term.[7] Leonard accounted for this dispositive data by ignoring it.

Moreover, even though Leonard previously relied on generic use of "pods" in a mere six municipal ordinances spread across as many states to support an opinion of genericness, here he interpreted evidence of generic use of "overhead door" in at least two municipalities in the State of Georgia as supporting the **opposite** conclusion. (Exs. C-D.) Because the research that Plaintiff's counsel did for Leonard did not include all

---

[7] Moreover, COCA is not directed (or related whatsoever) to assessing usage by consumers of overhead garage door products nor is it segmented by geographic locale or specific to Atlanta. Its usefulness as a proxy is therefore dubious at best.

available examples of generic use, and Leonard did no research on his own, he did not even know about one of them. (Ex. A, 59:1-19; Ex. D; Ex. E at 4-11.)

Leonard went to great lengths to avoid confronting industry reality in other ways, too. For instance, his examination of industry trade associations went only so far as running a Google search, stopping short of looking at whether and how these organizations used "overhead door" generically. (Ex. A, 132:23-133:2, 141:3-142:7; Ex. B, ¶ 42.) Had he clicked on any links, he would have seen that IDEA (which he references in his report) refers to "individuals and companies involved in the *overhead door industry*" and that the trade association "was created by a coalition of *overhead door organizations*." (Ex. K at 3; Ex. L at 2 (emphasis added).) When confronted with this material at deposition, he went so far as to propose that these references might be to a single company, ODC, and he refused to acknowledge that companies unrelated to ODC participate in this established international industry. (Ex. A, 134:2-135:21.) According to Leonard, "the important thing is the high-level Google search." (Ex. A, 1414:20-24.) The "important thing," however, is that the "overhead door industry" is *not* exclusive to or co-extensive with ODC and is comprised of hundreds (if not thousands) of companies across the globe. (Exs. H-L, P, Q, X. Z, EE; ECF 11-4–11-9.)

Leonard categorically ignored OSHA documents reflecting generic use, industry publications making generic use, state rules using the term generically, documents referring generically to the industry, and evidence of hundreds of companies nationwide

with the word overhead in the registered names of their overhead garage door businesses. (Ex. A, 58:23-59:13, 116:18-117:14, 120:18-121:14, 122:25-124:9, 127-7:24, 131:5-132:2 & Exs. H-L, P, Q, X. Z, EE.) Although it was important to him in *Apple*, he also neglected to look to see if Plaintiff or ODC have themselves used the term "overhead door" generically to describe their products and services (although he said that might be interesting). (Ex. A, 335:20-13.) Had he, he would have found copious evidence of generic usage by each of Plaintiff and ODC. (Exs. AA,[8] BB, DD.) Again, because of the filtered, biased, misleading, and/or incomplete information he considered, Leonard was not even sure if the "overhead door industry" consists of anyone other than companies tied to Pace's "parent company." (Ex. A, 121:12-122:23.) Incredibly, none of his results-driven "research" yielded **any** evidence of industry rules, publications, or manuals dealing generically with overhead doors. (Ex. A, 127:17-128:10.) Other than what is noted in his report and the exhibits he was shown at deposition, which he had not previously seen because he never looked for them, Leonard was unaware of any (much less widespread) industry usage of "overhead door." (Ex. A, 249:21-250:16.)

Leonard also did not bother to look at many of the other categories of information that were critical to his analyses in *PODS* and *Apple*. For instance, he was not provided

---

[8] Exhibit AA contains a non-exhaustive sample of generic use of "overhead door" in the 2001-2016 Annual Reports of Plaintiff and its predecessor, E.E. Newcomer.

with, and did not look for, judicial opinions in which the term "overhead" was deemed generic (although he thought those "sound[] interesting," too). (Ex. A, 185:5-8, 193:7-15, 265:17-266:6.) Further, unlike in *Apple*, where Leonard relied on USPTO patent filings, he neglected to do so here. If he had, he would have found over 7,700 results for patents and applications containing "overhead door." (Ex. EE.) He also did not look to USPTO filings to see if or how many trademark applications with "overhead door" have been submitted and testified that whether a trademark is registered did not matter. (Ex. A, 189:25-190:5, 194:17-22.) His purported justification was that the USPTO website is hard to navigate and he did not know what he might learn. (Ex. A, 195:4-196:4.)[9]

In addition, even though Leonard openly admits that the reason he considered the LexisNexis databank in *Apple* was "**to see whether it's generic or not**" by comparing the proportionality of Apple-specific references to generic references, (Ex. A, 317:5-17; Exs. T & CC, ¶ 30), Leonard did not perform a similar analysis here based on his unscientific determination that – for some inexplicable reason – he "didn't need to," (Ex. A, 317:19-24).

Lastly, although Leonard testified that "[y]ou have to look at actual use of terms" and that you "[c]an't always abstract things," and that "usage" and "people" are

_____

[9] He notes one trademark registration in his report that he received from Plaintiff's counsel, but he did not look for any of ODC's other USPTO filings or filings by any of the many other companies that have sought to obtain registration of marks containing "overhead" or "overhead door(s)." (Ex. A, 292:23-293:25; Ex. EE.)

determinative of genericism, he did not speak to any consumers in the Atlanta market and the only person in Georgia with whom he spoke at all was Plaintiff's counsel, Charlie Henn. (Ex. A, 180:8-14, 282:17-283:3.) He was somehow satisfied that he had all he needed and remarkably assures that he considered a sufficient universe of "popular sources" to evaluate usage. (Ex. A, 197:14-22, 153:18-154:5.)

## II.   ARGUMENT

A trial judge is charged with a gatekeeping duty to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). "The importance of *Daubert's* gatekeeping requirement cannot be overstated." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). "The offering party must show that the opinion meets the *Daubert* criteria, including reliable methodology and helpfulness to the factfinder in understanding the evidence or determining a fact, by a preponderance of the evidence." *See Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1232 (11th Cir. 2009); *see also* Fed. R. Evid. 702.

### A.   Leonard Is Not Qualified To Offer His Proposed Opinions.

"To fulfill its role as a gatekeeper, the trial court must determine whether the expert has the requisite qualifications to offer the opinions he gives." *See Bowers v. Norfolk S. Corp.*, 537 F. Supp. 2d 1343, 1349 (M.D. Ga. 2007). The expert's

qualifications must concern the particular subject matter of his proposed testimony. *Id*.

at 1350; *accord Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999).

Leonard is not qualified as an expert in the subject matters of his proposed

opinions. He is "a linguistic scientist." (Ex. A, 95:24-25.) "Generic" is not a term used

in the field of linguistics, but Leonard promises, "I think I understand what it means in

trademark cases." (Ex. A, 33:5-11, 47:2; 8, 81:2-7.) He is not a lawyer, though, and

lacks any legal training. (Ex. A, 91:12-16.) His belief that he understands is based only

on his work with attorneys and by virtue of reading "a Harvard piece online." (Ex. A,

33:10-17.) He also ran a google search on the word generic since, "[r]emember, it's not

really a linguistic term and we have to match the linguistic data ***to help the case***." (Ex.

A, 110:16-18 (emphasis added).) "From counsel and from what [he] gathered," he

understands that the linguistic concepts of hypernyms and hyponyms "pretty much maps

on to the legal or the U.S. PTO definition of generic." (Ex. A, 46:4-47:6.) As further

discussed below, it does not.[10] His proposed testimony must be excluded because he is

not qualified to provide it. *See, e.g., Martinez v. Rabbit Tanaka Corp*., 2006 U.S. Dist.

LEXIS 97084, at *35 (S.D. Fla. 2006) (excluding unqualified expert); *see also SEC v.

Pasternak,* 2008 U.S. Dist. LEXIS 42460, at *8 (D.N.J. 2008) (excluding expert who

---

[10] Leonard did not attempt to measure consumer perception or to reach any opinions as to secondary meaning because he is not qualified to do those things either. Indeed, he is not even sure what a customer survey is. (Ex. A, 336:7-11.)

"has no particular expertise, knowledge, or experience" on the issue "that is the focal point of this action").

**B.    Leonard's Factual Foundation Is Insufficient And Unreliable.**

"A party's failure to support expert opinion with sufficient facts and data requires exclusion of the unsupported evidence." *See James River Ins. Co. v. Rapid Funding, LLC*, No. 07-cv-01146-CMA, 2009 U.S. Dist. LEXIS 14199, at *21 (D. Colo. Feb. 24, 2009). "[The] pre-admission determination (i.e., whether or not *enough* factors have been considered to make an expert report *sufficiently* reliable) is committed to the sound discretion of the district court, *not* the jury." *See Microstrategy Inc. v. Business Objects Americas, Inc.*, 429 F.3d 1344, 1355 (Fed. Cir. 2005). An expert's "choice in data sampling go[es] to the heart of his methodology." *See Allgood v. Gen. Motors Corp.*, 2006 U.S. Dist. LEXIS 70764, at *33 (D. Ind. 2006). "[C]herry-pick[ing] . . . facts fails to satisfy the scientific method and Daubert." *See Barber v. United Airlines*, 17 Fed. App'x 433, 437 (7th Cir. 2001). Thus, a putative expert may not offer opinions based "upon information spoonfed … by plaintiff's counsel." *See Crowley v. Chait*, 322 F. Supp. 2d 530, 542 (D.N.J. 2004). To permit an expert to act as "the mouthpiece" of a party by "allow[ing] him to offer testimony to a jury as to conclusions he has reached on the basis of [a] highly filtered version of events, is unacceptable." *See id.* at 546-47. Rather, an expert must "independently verif[y] the reliability of the data … as opposed to accepting it at the word of [party's] counsel" and "must base his opinions on facts

and data "of a type reasonably relied upon by experts in the particular field in forming opinions … upon the subject." *See Lyman v. St. Jude Med., Inc*., 2008 U.S. Dist. LEXIS 42015, at *14-15 (E.D. Wisc. 2008); Fed. R. Evid. 703. Leonard's proposed testimony runs afoul of these bedrock standards.

To be sure, when Leonard is retained in a trademark case, he does not follow any checklist or protocol to gather information and there is no standard data that he requests; rather, he sometimes asks for pleadings or depositions, and will look at any research performed by counsel or his client. (Ex. A, 35:16-36:3, 37:4-6, 83:3-6.) "That's about it." (Ex. A, 36:20-37:3.) When he relies on data compiled by counsel, whether he even gives counsel instructions as to the scope and parameters of searches to conduct for him "totally depends on the case." (Ex. A, 52:14-54:2.)

In this case, even though extensive written discovery had been conducted, thousands of pages of documents had been produced, and eighteen other witnesses were deposed, the only material in the record that Leonard reviewed, all of which was supplied by Pace's counsel, consisted of:

1. Transcripts of one of two 30(b)(6) depositions taken of Pace and of one of eight depositions of Pace's employees, (Ex. A. 37:20-39:2, 67:19-68:2);
2. A single exhibit - Exhibit 46 - to one of the 19 other depositions (Ex. W); and
3. 66 pages of printouts selected by counsel of Pace's advertising. (Ex. G.)

(Ex. A, 37:20-39:2, 67:19-68:2, 72:1-7, 72:23-73:15; Ex. F ¶ 5.) Leonard had no idea how many depositions were taken and did not know why only two transcripts were

given to him. (Ex. A, 37:20-30:2.) He was not provided – and did not know about

because he did not ask for – transcripts from the depositions of (among others): (i)

Aaron or any named Defendant; (ii) Larry Conte, the owner of Aaron Overhead Door in

California; (iii) Creative Anvil, Pace's outside marketing company; or (iv) any of seven

other employees of Pace. (Ex. A, 37:20-30:2.)

Leonard does not recall even asking for any specific documents, but recalls only

asking about "how Overhead Door represented themselves on the web," and knows that

the webpage and social media printouts that he reviewed were supplied by counsel as a

"sample." (Ex. A, 73:16-75:9; Ex. G.) He conceded that at least some portion of this

material was itself irrelevant. (Ex. A, 76:9-22.)

Aside from this sliver of the record, counsel also provided to Leonard:

1. Case law excerpts defining "generic," including the one Leonard picked because
   it had "more sentences," (Ex. E at 12); and
2. Select municipal ordinances containing the words "garage door" or "overhead
   door" in 15 counties and a list of 68 municipalities in which counsel did not
   locate either phrase in the ordinances. (Ex. E, at 4-11.)

Leonard did not review all of the ordinances identified in counsel's research and thinks

"[i]t's foolish to exclude data just because someone other than [him] collected it." (Ex.

A, 48:20-21, 54:6-20.[11]) One of the municipal ordinances in Plaintiff's counsel's

---

[11] For this reason, Leonard thinks that the Court in *PODS* simply got it wrong by
criticizing his "blind acceptance of and reliance on one-sided data" from Plaintiff's
counsel. (Ex. A, 47:7-48:22). *See PODS*, 2014 U.S. Dist. LEXIS 193895, at *11.

compilation used the term "overhead doors" generically and Leonard testified that it "was the only example [he] could find." (Ex. A, 56:4-9, 56:18, 57:11-58:18, 58:20-21; Ex. C.) There's no indication that he looked, however. When presented at deposition with an another Georgia ordinance using "overhead door" generically and asked if and why he did or did not look at it, he testified that he had not seen it and did not look for such evidence "[b]ecause [he] had enough evidence" from ordinances [in other counties]." (Ex. A, 58:23-59:13; Ex. D.)

Based on the limited and filtered data that Leonard reviewed, he concluded that "the fact that we do not find 'overhead door' as the common reference for these doors suggests that it is not generic." (Ex. A, 144:22-25.) Even assuming that whether a term is or is not the "common reference" is the right litmus test (which it is not), Leonard's proposed opinions still could not make it through *Daubert's* gate for the simple reason that he failed even to consider the endemic common usage of "overhead door" by industry trade organizations, state and federal regulatory bodies, and other companies in Georgia and nationwide. (*See, e.g.*, Exs. H-L, N, P, Q, X, Z, AA, BB, DD, EE.) Still more references are contained even in the limited subset of data that he deigned himself to review. (Exs. M & O.) Leonard ignored all of it.

Consideration of Leonard's proposed testimony would give "the impression that his opinion is the product of some systematic collection of facts and data … when, in fact, the opposite is true." *See James River Ins. Co.*, 2009 U.S. Dist. LEXIS 14199, at

*24-25. Indeed, "[i]n contradiction to his maxim that linguists must examine 'all available data' to reach a valid conclusion, Dr. Leonard did not do so" and instead "examined only a miniscule subset of available data." *See PODS*, 2014 U.S. Dist. LEXIS 193895, at *9. His proposed testimony must be excluded. *See, e.g.*, *San Diego Comic Convention v. Dan Farr Prods*., Case No. 14-cv-1865, 2017 U.S. Dist. LEXIS 147574, at *20 (S.D. Cal. Sept. 12, 2017) (excluding linguist whose opinions were unreliably drawn "from a narrow field of documents, most of which were provided to him by [retaining party]" because such data did not "accurately depict how consumers presently understand the phrase" at issue).

### C.   Leonard's "Methodology" Is Unreliable.

To meet its gatekeeping obligation, the trial court must "evaluate the reliability of the testimony before allowing its admission[.]" *See Frazier*, 387 F.3d at 1262.

#### 1.   Leonard's Case-Specific Approach Is Unreliable.

"[W]hether the expert is proposing to testify about matters 'growing naturally and directly out of the research they have conducted independent of the litigation, or whether they have developed their opinions expressly for the purposes of testifying'" is a "significant inquiry weighing on reliability." *In re Apollo Grp. Inc.,* 527 F. Supp. 2d 957, 961 (D. Ariz. 2007). "Reliance on an invented methodology that has not been generally accepted by experts in the field, standing alone, is sufficient to exclude [expert's] opinion." *In re Nellson Nutraceutical, Inc*., 356 B.R. 364, 375 (Bankr. D. Del.

2006). Expert opinions are unreliable if the expert "starts with his conclusion … and then works backward for reasons to explain this conclusion." *Lake Mich. Contractors, Inc. v. Manitowoc Co.*, 225 F. Supp. 2d 791, 802 (W.D. Mich. 2002).

Leonard did not employ any systematic approach to synthesize the incomplete information he bothered to review. Far from employing a step-wise analysis of whether a term is generic that would apply irrespective of the particular engagement, he took a case-specific approach through which he manipulated data to yield the conclusions he was paid to reach. Because Leonard develops his methodology on a case-by-case basis, his prior reports are the only authoritative source he could identify to support his approach. (Ex. A, 27:12-18.) Not only is this problematic of itself, but also what he did here is contrary to what he did in *Apple* or *PODS*. His litigation-driven approach is antithetical to *Daubert's* fundamental teachings and renders his testimony inadmissible. *See, e.g., United States v. Fleet Mgmt. Ltd.*, 2008 U.S. Dist. LEXIS 34970, at *23 (E.D. Pa. 2008) (excluding expert who "approached his investigation with a particular conclusion in mind … and, without using any clearly-defined methodology, much less any intellectually rigorous analysis, he concluded that select facts and data could be interpreted to support that conclusion").

In addition to the definition of "generic" that Leonard liked most because it had "more sentences," Leonard cites to the concepts of "hypernyms" and "hyponyms" used in the field of linguistics "to categorize how language works." (Ex. A, 31:3-8, 47:1-6,

Ex. B, ¶¶ 25, 37-41.) Notably, this is different from the methodology Leonard employed in *Apple* or *PODS*, and he admits that he "draw[s] up a plan of how to investigate" on a case-by-case basis. (Ex. A, 26:14-25, 27:12-29:13 ("you would not be able to find . . . a source in the library" to support his methodology).) He even admitted that the methodology he employs in a given case is dictated by the evidence that he is provided to review and openly advertises that, "[e]verything depends on the individual case." (Ex. A, 35:2-9, 50:12-13.) He certainly cites to no academic or other source indicating that the hyponym/hypernym dichotomy or anything else he did has ever been recognized as a reliable method to assess genericism. Indeed, to the extent that he himself ever relied upon the hypernym/hyponym distinction before, he did so to conclude that "pods," a hyponym of the hypernym "container," was generic based on his belief that hypernyms and hyponyms are synonymous. (*See supra* n.3.) Yet, here, he relies on the fact that "overhead door" is a hyponym of "garage door" to reach the complete opposite conclusion. He cites no source to validate this approach (or his opposite approach in *PODS*, for that matter). Nor does he point to any authority to support his rejection of a proportionality analysis in favor of one that simply compares how many hits one generic term generates on COCA compared to a lesser-used generic term. He similarly does not identify any test under which endemic use of a term by competitors and throughout an industry is irrelevant to the genericism inquiry or one that reliably lends itself to a conclusion that a term is non-generic when 93% of the usage is generic. The reason is

that there isn't any. *See, e.g.*, *Firefly Digital Inc. v. Google Inc*., 817 F. Supp. 2d 846,

860 W.D. La. 2011) (collecting cases in which consumer surveys showing brand

identification of 12% and 21% were insufficient to overcome a finding of genericism).

In fact, had Leonard read all of the sentences of the opinion on which he puts much

stock, *Welding Servs. v. Forman*, 509 F.3d 1351, 1359 (11th Cit. 2007), he would have

seen that the very source upon which he purports to rely teaches that "[a] would-be

proprietor's use of the words in the mark to refer to the kind of services it and its

competitors provide is powerful evidence that the words in the putative mark are being

used generically." And among the data that Leonard ignored is evidence of significant

generic usage by both Plaintiff and ODC. (Exs. AA, BB, DD.) Leonard's proposed

testimony is inadmissible. *See, e.g.*, *United Co. v. Keenan*, 2007 U.S. Dist. LEXIS

88049, at *52 (W.D. Va. 2007) (excluding expert where there was not "a single case in

which an expert employed the methodology utilized by [the expert]" or "any scholarly

work recognizing the methodology"); *Lantec, Inc. v. Novell, Inc.,* 2001 U.S. Dist.

LEXIS 24816, at *27-28 (D. Utah 2001) (excluding expert who, "in effect, supplied a

bottom line, but no more" and who was "clearly a hired gun and any semblance of

objectivity is lacking"); *accord Munoz v. Orr*, 200 F.3d 291, 301 (5th Cir. 2000). Much

like he did in *PODS*, Leonard "ignored data suggesting a contrary conclusion" to the

one advocated by the party that retained him. *See PODS*, 2014 U.S. Dist. LEXIS

193895, at *10. His methodology, which was "designed to avoid confronting self-

- 23 -

interested theory with measurable facts" is "indefensible" and inadmissible. *See Lava Trading, Inc. v. Hartford Fire Ins. Co*., 2005 U.S. Dist. LEXIS 4566, at *47 (S.D.N.Y. 2005).

### 2.    Leonard's Approach Fails All of *Daubert's* Guideposts.

"The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'" Fed. R. Evid. 702 advisory committee's note. Rather, the trial court must consider factors such as testability, peer review and publication, and general acceptance. *Daubert*, 509 U.S. at 593-94. Putative expert opinions "connected by the ipse dixit of the expert" are inadmissible. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). "An expert's work is only admissible if it is 'reasoned, uses the methods of the discipline, and is founded on data.'" *Stein v. Pacific Bell*, No. C 00-2915 SI, 2007 U.S. Dist. LEXIS 19193, at *33 (N.D. Cal. Mar. 19, 2007) (internal citation omitted). These fundamental rules apply to linguistic no less than they do to experts in any other field. *See, e.g.*, *San Diego Comic Convention*, 2017 U.S. Dist. LEXIS 147574, at *20 (excluding linguist whose "report fails to explain the reasoning or methodology behind his opinions" and "lacks an explanation as to … whether the linguistic tests and principles he employed have been used by others to determine genericness"). Leonard's work falls far short. *See, e.g.*, *id.; Birge v. Dollar Gen. Corp*., No. 04-2531 B/P, 2006 U.S. Dist. LEXIS 97195, at *40 (W.D. Tenn. Sept. 29, 2006) (excluding expert whose "inability to cite to any standards in the [pertinent] industry to support his opinions

renders [his] testimony unreliable").

Leonard's proposed testimony rests on nothing more than his subjective and untestable determination that the evidence he selectively reviewed supports his argument. After categorically ignoring, dismissing, or torturing the only reasonable interpretation of all evidence against Plaintiff's position, Leonard's testimony boils down to his promise (over and over) that the evidence supporting the result he was retained to reach is "overwhelming." (Ex. A, 88:1-7, 89:3-8, 109:4-5, 113:6-8, 195:23-196:4, 201:11-16, 244:14-18, 262:1-6, 268:16-22, 295:3-5; 301:17-21; Ex. B, ¶ 17.) In addition to usurping impermissibly the fact finder's role to weigh evidence (albeit based on a skewed universe of facts), Leonard's approach violates *Daubert's* prohibition of "trust me, I'm an expert" testimony. *See, e.g.*, *Ankuda v. R.N. Fish & Son, Inc.*, 535 F. Supp. 2d 170, 173-74 (D. Me. 2008) (excluding expert who "construct[ed] no bridge from his experience to his conclusions" and "offer[ed] only his say-so"); *see also Birge*, 2006 U.S. Dist. LEXIS 97195, at *40 (excluding say-so expert).

Leonard's methodology fails *Daubert*. It is neither tested nor testable; it was developed in the context of and for the purpose of reaching opinions in this case; he extrapolated unreasonably from a one-sided subset of data while ignoring wholesale all of the readily-accessible data that undermines his pre-determined conclusions; there is no evidence that it has ever been recognized in the field of linguistics or known to produce reliable opinions as to genericness. There is no evidence that anyone –

- 25 -

including Leonard himself – ever employed a methodology like the one he invented in this case. Indeed, a methodology which contradicts Leonard's own prior methodology! Courts do not hesitate to exclude experts under such circumstances. *See, e.g.*, *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 645-46 (S.D.N.Y. 2016) (excluding expert who professed to apply "the tools and insights of, *inter alia*, semantics/linguistics" where expert's "methodology does not come close to withstanding scrutiny under *Daubert*"). Indeed, Leonard's newly-devised process is too nebulous even to permit a meaningful *Daubert* analysis, leaving no question that *Daubert*'s reliability mandate cannot be satisfied. *See, e.g.*, *Am. Gen. Life & Accident Ins. Co. v. Ward*, 530 F. Supp. 2d 1306, 1314 (N.D. Ga. 2008) (excluding expert where there was no "identifiable 'methodology' to which the Court can apply the *Daubert* factors"); *Lake Mich. Contrs.*, 225 F. Supp. 2d at 803 (excluding expert who could not "explain the methodological basis for his conclusions").

As noted above, there is a dearth of authority to support the reliability of the hypernym/hyponym theory on which Leonard relies. Nor is there any objective (or other) support for the conclusions Leonard proposes to extrapolate from COCA. Indeed, the only case that mentions use of COCA data by a linguistic expert involves an expert who performed a proportionality analysis like the one that Leonard performed in *Apple* but neglected to do here. *See Deckers Outdoor Corp. v. Australian Leather Pty Ltd.*, 340 F. Supp. 3d 706, 708 (N.D. Ill. 2008). In *Decker*, in addition to commissioning three

separate surveys showing that 89%-98% of consumers in the relevant market understood UGG to be a brand name, the plaintiff retained a linguist who researched many databases, among them COCA, during two distinct time periods and found ***no evidence of any generic use during the 16 years of data that she reviewed***. *See id*. at 715-16. Thus, the expert employed a methodology that included the approach that Leonard undertook in *Apple*, which he did not utilize here because it did not support the result that he wanted.

Similarly, whereas Leonard relied on his findings that traditional dictionaries contained no entry for "App Store" and that online dictionaries all set forth Apple-specific definitions to support his opinions that the term was non-generic, he found definitions for "overhead door" in the Collins English Dictionary and in three online dictionaries, none of which provided company-specific definitions; instead, each defined "overhead door" generically. (Ex. B, ¶¶ 50-51.) Yet, Leonard inexplicably concluded that this data supports a conclusion that "overhead door" is non-generic.

None of Leonard's other scattershot ideas fare any better because they all suffer from the core defect that "there is simply too great an analytical gap between the data and the opinion proffered." *See Joiner*, 522 U.S. at 146. For instance, Plaintiff's counsel had Leonard look at Google Trends data in two localities in which ODC does not operate a distributorship (Laredo, TX and Alexandria, LA). (Ex. A, 168:6-169:2; Ex. B,

¶¶ 59-65.)[12] Not only are these two markets vastly different from one another in terms of the number of business with "overhead" in their names, (Exs. X & Y), but also each market is dissimilar from the relevant Atlanta market, (Ex. Z). Leonard did not look at or analyze this data, nor did he concern himself with the size of the Alexandria or Laredo markets compared to Atlanta or the relative populations of the disparate localities. (Ex. A, 324:18-325:6.) He did not look to see if or how many other companies in either region used "overhead door" or "overhead" in their names and did not think he needed to because "the advertising and everything of Atlanta" he was given was somehow a "sufficient" substitute. (Ex. A, 170:24-171:15, 175:17-174:10, 179:4-16, 261:1-8, 327:8-14.) But Plaintiff's advertising has nothing to do with a comparative market analysis, and tellingly Leonard cites no source to support his dubious claim otherwise. In fact, the *Welding* opinion on which Leonard purportedly relies for his definition of generic makes clear that such evidence is legally irrelevant. *See Welding Servs.*, 509 F.3d at 1360 (holding that the amount spent on advertising is irrelevant to genericness and that the genericness inquiry "requires a different kind of evidence").

---

[12] In *PODS*, Leonard disavowed reliance on Google because "[t]he problem with using Google for anything legal is we don't know what their algorithms are." (Ex. O, 31:22-24, 32:7-33:8; *see also id.* 34:7-15 ("Google is unknowable"); *id*. 54:25 ("You can't rely on Google."); *id*. 55:19:21 ("you don't know the algorithm, you don't know what Google is counting"); *id*. 89:24-25 ("you can't know what you are getting when you get data from Google.").) Just like he doesn't know Google's algorithms, he freely admits that he doesn't know the algorithms that underlie Google Trends either. (Ex. A, 105:15-17; 254:25-255:3.)

Of course, one would expect to find more searches for "overhead door" in a market in which multiple companies operate with these words in their tradenames as compared to a market in which there were few or none. Any extrapolation from the Google Trends data would therefore necessarily need to factor in and analyze the overall marketplace, which Leonard neglected to do. (Ex. A, 320:13-321:2.) Instead, his analysis is predicated on nothing more than an unfounded assumption that, because there is an ODC distributorship in Atlanta and people in Atlanta searched for "overhead door," those people must have been searching for Plaintiff. It is equally likely, of course, that some or all of these searchers were looking for one of the other companies with "overhead door" in their names or were searching generically for a list of companies in the overhead garage door industry. Leonard openly admits that he does not know if any of the searchers were looking for Plaintiff, leaving him unable reliably to opine as to the *usage* of the term "overhead door" by any of the unknown searchers. (Ex. A, 321:15-322:1.) He did nothing to account for the various possible interpretations of his data by, for instance, conducting a consumer survey or otherwise performing any quantitative analysis of the Atlanta market. Most critically, he points to no authority – in the field of linguistics or any other field – to so much as suggest that research of the sort he did using Google Trends is a reliable way to determine genericness. As a result, his data simply does not permit him reliably to reach his proposed opinions. *See, e.g.*, *San Diego Comic Convention*, 2017 U.S. Dist. LEXIS 147574, at *20 (excluding linguist's

unreliable opinions where the court was "unpersuaded that [expert]s] conclusion could be reliably drawn from the constricted and somewhat biased world view that [expert] bases his opinion on").

Worse still, Leonard's approach is distinctly **<u>unlike</u>** the approach he took in *Apple* where even he acknowledged that proportionality (i.e., generic usage of "overhead door" versus branded usage) is essential to a genericness inquiry. Courts have acknowledge this, too. *See, e.g.*, *Ty, Inc. v. Softbelly's, Inc.*, No. 00 C 5230, 2006 U.S. Dist. LEXIS 100736 (N.D. Ill. Apr. 7, 2016) (excluding linguist who relied heavily on data from counsel and who failed to evaluate the proportionality of generic versus non-generic use of the alleged mark). The reason for this is that, without such an analysis, there is no basis on which to measure the primary significance of a mark to actual and potential purchasers of the goods and services. This is the pertinent inquiry. See 15 U.S.C. § 1064(3). Leonard's failure to perform such an analysis can only be explained by the fact that it results in the opposite conclusion from the one he was paid to reach.

There is simply no credible authority to establish the reliability of Leonard's makeshift, case-by-case "method." As he did in *PODS*, Leonard "ignored data suggesting a contrary conclusion." *See PODS*, 2014 U.S. Dist. LEXIS 193895, at *10. This sort of advocacy is *Daubert's* raison d'etre. His proposed testimony is inadmissible. *See, e.g., In re Bextra & Celebrex Mktg. Sales Practices & Prod Liab. Litig*, 524 F. Supp. 2d 1166, 1176 (N.D. Cal. 2007) (excluding expert who "reache[d]

his opinion by first identifying his conclusion . . . and then cherry-picking observational studies that support his conclusion and rejecting or ignoring the great weight of the evidence that contradicts his conclusion.").

### D.      Leonard's Proposed Opinions Are Irrelevant And Lack "Fit."

"One of the most important aspects of the relevance evaluation is the question of 'fit.' In assessing 'fit,' the court must determine whether the 'expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" *CRST Van Expedited, Inc. v. J.B. Hunt Transport, Inc.*, No. CIV-04-0651-F, 2006 WL 2054646, at *1 (W.D. Okla. July 24, 2006) (internal citation omitted); *see also In re Apollo Group.*, 527 F. Supp. 2d at 959-60.

### 1.      Leonard's Definitional Framework Is Legally Erroneous.

Based exclusively on his interpretation of the excerpt from the *Welding* opinion that he liked because it had "more sentences," Leonard believes that the number of times one generic synonym is used instead of another generic synonym is determinative of true genericism and that only one of two synonyms can earn the title of "generic." (Ex. A, 264:5-11, 267:4-268:6.) Leonard is wrong.

"[T]he existence of synonyms for a term does not mean the term is not generic. There may be more than one term which the consuming public understands as designating a category of goods." *See Loctite Corp. v. Nat'l Starch & Chem. Co*., 516 F. Supp. 190, 201 (S.D.N.Y. 1981) (finding "Super Glue," "Instant Glue," and "Ten

Second Glue" to all be generic). "There is usually no one, single and exclusive name for a product. Any product may have many generic designations. Any one of those is incapable of trademark significance [and] [a]ll of the generic names for a product belong in the public domain." *See Shire City Herbals, Inc. v. Blue*, 410 F. Supp. 3d 270, 296 (D. Mass. 2019) (citing 2 McCarthy on Trademarks & Unfair Competition § 12:9) (listing examples: car and automobile, sofa and couch, dresser and bureau); *accord Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976).

Leonard's proposed opinion is that "garage door" appeared more times than "overhead door" in the material he reviewed. His opinion is irrelevant for the simple reason that ***"[t]he question . . . is not whether a term is more frequently chosen colloquially than any of its synonyms.***" *See S. S. Kresge Co. v. United Factory Outlet, Inc.*, 598 F.2d 694, 696 (1st Cir. 1979) (emphasis added). This is the **only** question that Leonard tried to answer.

Leonard also purports to testify that "overhead door" is "a descriptive term," but aside from counsel's "instruction" that the classification of "descriptiveness" broadly encompasses any term "that describes a feature, quality or characteristic of a product or service." he has no understanding of what "descriptive" means and had no basis on which to demarcate the line between "generic" and "descriptive" because "descriptive is sort of a legal thing." (Ex. A, 20:7-10, 155:19-25, 186:25-188:9, 274:10-24. Ex. B, ¶ 27.) Under Leonard's definitional schema, (*id.* 290:22-281:4), "computer" would be

generic, but "laptop computer" would be descriptive. "Clothing store," "plus-sized clothing store," "men's clothing store," and "children's clothing store" would all be descriptive. The law is otherwise. *Cf.*, *A.J. Canfield Co. v. Honickman,* 808 F.2d 291, 308 (3d Cir. 1986) ("chocolate fudge" is generic for chocolate-fudge flavored soda).

Expert testimony based on a misunderstanding of the pertinent trademark definitions is subject to exclusion. In *J & J Snack Foods Corp. v. Earthgrains Co.*, 220 F. Supp. 2d 358, 369 D.N.J. 2002), for instance, the court excluded plaintiff's survey expert whose analysis was based on a fundamental misunderstanding of the definitions of the relevant classifications under trademark law. *See id*. Specifically, the *J&J* expert misunderstood a descriptive mark to be one that "bring[s] to mind a specific product, but [is] not the common way of referring to the product category." *See id*. at 371. Because the expert's opinions were not based on "the correct, recognized and binding definition of a descriptive term under trademark law," his resulting opinions were "completely untrustworthy and unreliable" and had "no relevance or bearing on whether the mark is descriptive under the proper legal definition of a descriptive mark." *See id*. at 370-71. The same is true here.

Because Leonard's opinions depend on incorrect definitions, not only is his testimony irrelevant, but also it would confuse the issues with a legally-erroneous test. *See, e.g., Acad. of Motion Pictures Arts & Scis. v. Godaddy.com, Inc.*, CV 10-3738 ABC (CWx), 2013 U.S. Dist. LEXIS 198591, at *8 (C.D. Cal. June 21, 2013)

- 33 -

(excluding linguist who "compared the wrong things"); *Feinberg v. Katz,* 2007 U.S. Dist. LEXIS 94967, at *14, 23-24 (S.D.N.Y. 2007) (excluding opinions that were irrelevant under governing substantive law).

### 2.    Leonard Failed To Evaluate Consumer Perception.

Leonard's proposed opinions lack fit for another important reason, too – namely, they lend no insight into the primary significance of the term "overhead door." The Lanham Act itself itself provides the test for genericness: "[t]he primary significance of the . . . mark to the relevant public. . . shall be the test." *See* 15 U.S.C. § 1064(3). "The relevant public are actual or potential purchasers of the goods in question." *See PODS Enters. v. U-Haul Int'l, Inc*., No. 8:12-cv-01479-T-27MAP, 2015 U.S. Dist. LEXIS 29849, at *5 (M.D. Fla. Mar. 11, 2015). "Courts consider a variety of evidence relevant to the issue of genericness, including dictionary listings, usage in the popular and specialized media, in the military, in patents, and in industry, and usage by competitors, by the holder of the trademark, and by the government." *See id*, at *7. "When determining how the public views the mark, courts should consider sources such as consumer surveys, use of the mark in media publications, use of the mark by competitors in the industry, and the trademark claimant's use of the mark." *See FN Herstal, S.A. v. Clyde Armory, Inc*., No. 3:12-CV-102, 2015 U.S. Dist. LEXIS 4310, at*39 (M.D. Ga. Jan. 8, 2015). As discussed above, Leonard considered none of these and even made clear that he found widespread industry usage unimportant. His opinions

cannot overcome the law. *See, e.g.*, *id.*, at \*42 (recognizing that, "[i]f other competitors in the market use the mark, then that is probative evidence that the mark is merely descriptive or generic because, the more the public sees the mark used by others in the industry, the less likely the public will identify the mark with one particular producer.").

After being presented at deposition with a sampling of the data that he categorically ignored, Leonard described Atlanta as "a place where people, as you have shown us, are probably *surrounded by marks with 'overhead door*.'" (Ex. A, 262:15-17,) Yet, he did nothing to evaluate what these consumers thought about all of these marks in their surroundings. That a certain subset of the population might use "garage door" with greater frequency than "overhead door" has nothing to do with whether consumers perceive both terms to be generic. *See Magic Wand, Inc. v. RDB, Inc.*, 940 F.2d 638, 640 (Fed. Cir. 1991) (articulating the test as: "What do the buyers understand by the word for whose use the parties are contending?"). This is the only question that matters. Because Leonard's proposed testimony is of no assistance to answering it, his testimony is inadmissible. *See, e.g.*, *San Diego Comic Convention*, 2017 U.S. Dist. LEXIS 147574, at \*20 (excluding linguist's opinions on genericness where the expert relied on insufficient data and failed to address the pertinent question of primary significance);; *S. S. Kresge Co*., 598 F.2d at 696 (appellants failed to show "that the term has any [non-generic] meaning in the minds of the consuming public"). Leonard's opinions and testimony must be excluded altogether.

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

D.H. PACE COMPANY, INC., d/b/a
OVERHEAD DOOR COMPANY OF
ATLANTA,

      Plaintiff,

v.

AARON OVERHEAD DOOR
ATLANTA LLC, JEREMY RYAN
LUCIA and STEPHENIE LUCIA,

  Defendants.

Civil Action
File No. 1:17-cv-03430-MHC

## <u>LOCAL RULE 7.1 D CERTIFICATION</u>

Counsel hereby certifies that the foregoing was prepared in Times New Roman, 14-point font, in accordance with LR 5.1 B, NDGa.

This 26th day of March, 2020.

*/s/ Samantha R. Mandell*
Samantha R. Mandell
*Counsel for Defendants*