**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| D.H. PACE COMPANY, INC., d/b/a OVERHEAD DOOR COMPANY OF ATLANTA, <br><br> Plaintiff, <br><br> v. <br><br> AARON OVERHEAD DOOR ATLANTA LLC, JEREMY RYAN LUCIA, and STEPHENIE LUCIA, <br><br> Defendants. | CIVIL ACTION NO. 1:17-cv-03430-MHC |

## <u>DECLARATION OF DR. ROBERT LEONARD</u>

I, Dr. Robert Leonard, make the following declaration:

1.     I am over the age of twenty-one and am competent to make this Declaration. The statements made herein are based on my personal knowledge and expertise and experience in the scientific field of linguistics.

## I.     **Background**

2.     On August 10, 2018, I provided an expert report in the above-captioned case (the "Expert Report"). On August 28, 2018, I provided deposition testimony in this case. This Declaration is offered for the purpose of clarifying the

record and in response to several inaccurate or misleading statements made in Defendants' Motion to Exclude my testimony ("Defendants' Motion").

3.      My credentials are set out in detail in my Expert Report and my Curriculum Vitae attached thereto. Briefly, I am a tenured Professor of Linguistics at Hofstra University, where I am also the Director of the Graduate Program in "Linguistics: Forensic Linguistics." Over the past several decades, I have taught thousands of undergraduate and graduate level students in the theory and application of linguistics.

4.      I hold a Ph.D. from Columbia University. In my doctoral preparation at Columbia University, I had two linguistic research and training specialties: *theoretical semantics*, which studies how humans create and understand linguistic meaning, and *sociolinguistics*, which studies language use and meaning *in situ*, language as it is used by humans interacting in the real world—actual usage, on the ground. I additionally studied lexicography ("dictionary-making") at Columbia.

5.      I have offered opinions as an expert in linguistics in U.S. District Courts in Newark, NJ, Austin, TX, New York, NY, San Jose, CA, Tampa, FL, and Denver, CO, and in state court proceedings in Arizona, California, Colorado, Florida, Illinois, Indiana, Michigan, Montana, New Jersey, New York, Nevada, and Pennsylvania, and I have also testified before World Bank ICSID Tribunals in Washington, DC, and Paris, France.

## II.     The Science of Linguistics

6.     Linguistics is the scientific study of language and is one of the sciences recognized by the American Academy of Sciences. Linguists systematically observe patterns of data, patterns of linguistic behavior and—like all scientists—build theories that explain and predict those patterns through the construction and testing of hypotheses. The principles that emerge from linguistic analysis are published in professional journals that are vetted prior to publication and are subject to peer review which comments upon and tests the hypotheses contained therein. The linguistic principles that I apply in my analyses, including in this case, are based in this scientific, peer-reviewed process.

7.     Linguists have been called on for decades to investigate questions of genericness in trademark cases, and have routinely testified in many federal courts on such issues of genericness. In my deposition (pp. 214-16), I identified Dr. Roger Shuy, Georgetown University Distinguished Research Professor of Linguistics, Emeritus, as one of the leaders in our field. In his 2002 book <u>Linguistic Battles in Trademark Disputes</u>, Dr. Shuy noted: "From the biological sciences we learn that "generic" means that a name is related to or characteristic of an entire group or class of things. . . . An important linguistic question concerns when and how a word can become generic." (p. 32.)

8.      Dr. Shuy further explained why the science of linguistics is particularly apt in assessing the meaning of words in trademark disputes:

> [Linguistics is comprised of] core components as phonology (the system of sounds), morphology (the system of word parts), lexicon (the vocabulary), syntax (the system from which sentences are constructed), and discourse analysis (the language's system for putting sentences together to make a unified discourse). But we still haven't mentioned meaning, one of the major ingredients of linguistic analysis. The meaning conveyed in either written or spoken language is called semantics (referring to the direct, core meaning of words in isolation, as in a dictionary) and pragmatics (the way meaning is conveyed indirectly or through context). In each component, linguists discover the system, how it works, and what this can say about predicting future use. This constitutes the authority of linguistics which is relevant, in this case, to trademark disputes. (p. 18.)

9.      In addition to following scientific linguistic processes in investigating the issues in the present case, and, understanding that different jurisdictions have different legal standards for genericness, I asked counsel to provide me with a statement of the test for genericness in this Court. I reviewed that legal test not because I intended to offer any legal opinions; rather, it is my standard procedure to do my best to ensure that the linguistic evidence and my methodologically-appropriate analysis are consistent with the test in the relevant jurisdiction.

## III.   My Methodology and Analysis

10.     As I stated in my Expert Report, linguists systematically observe patterns of data, patterns of linguistic behavior, and build theories that explain the non-randomness of that data through the construction and testing of hypotheses. In

4

this case, I carefully and systematically applied established principles accepted in my academic field to undertake a comprehensive linguistic analysis of the meaning and usage in American English (and, particularly, in Metro Atlanta) of the phrases OVERHEAD DOOR COMPANY OF ATLANTA and OVERHEAD DOOR.

11.     Specifically, I examined whether the linguistic evidence supported the hypothesis that either of those terms is commonly used by the relevant public as the name of (i.e. to *identify*) a genus of products or services, or, rather, the competing hypothesis that the terms *describe* a feature of a product or service, or to identify *who* offers that product or service.

12.     Based on my systematic analysis of the evidence, the data support the conclusion that the terms are not generic because they are not commonly used by the relevant public as the name of (i.e. to identify) a genus of products or services. The methodology utilized in this case is generally accepted by professional scientific linguists to analyze genericness (e.g., Shuy, 2002) and includes examining corpora, dictionaries, and other evidence of language use, as described in my Expert Report.

13.     Defendants' Motion, without justification, asserts that I "manipulated the data to yield the conclusions [I] was paid to reach" Dkt. 154 at 21-22. That is entirely untrue. As I explained in my deposition, my methodology does not change over time, but "every case is different so every case presents a certain body of

evidence." (Dep.at p. 35.) My assessment of the evidence is not in any way based on who retains me or on any desired outcome; rather, it is based entirely on a professional linguistic testing of hypotheses and evaluation of the evidence that is appropriate in each particular case. Here, that body of evidence was extensive, and included corpora such as the Corpus of Contemporary American English (COCA), dictionaries of American English, and evidence of language use by the relevant public (i.e., consumers of garage-door products and services).

### A.    Corpora Analysis

14.    Corpus analysis is an empirical approach to the study of language variation and use, which allows researchers to analyze large quantities of authentic language in order to reveal results with more generalizability and validity than would otherwise be possible. The goals of corpus analysis are to examine patterns of variation with regard to meaning and to examine contexts that affect such variation. For decades, corpus methods have been revolutionizing all branches of linguistics and, more recently, providing more scientifically-grounded insights into the study of language, especially in cases of trademark disputes.

15.    In particular, linguists have used and have encouraged the use of corpora (sometimes referred to as "databases") and dictionaries for decades to investigate meaning in trademark cases. For example, in a case from 1992

(*Registry Hotel Corporation d/b/a Hospitality Management Corporation v. Hospitality Management Company*), Shuy states that he:

    a. suggested that Little's law firm conduct a computerized database search for the occurrence of the words "hospitality management" in major newspapers and magazines[1] beginning in 1980 to determine whether or not the expression gave evidence of being used generically. (p. 47)

    b. Having determined these categories in which "hospitality management" was used [in the databases/corpora], the next step was to discover how the meaning was conveyed. We have many examples of how to do this, beginning with the *Oxford English Dictionary ...* Other more modern dictionaries, including *Webster's Collegiate Dictionary* and the *Thorndike-Barnhart Dictionary ...* **Such practice is good, scientific lexicographic procedure.** (p. 26, bolding added)

16.     When performing corpus analyses, linguists regularly consult two kinds of corpora: general and specialized, each of which may play a vital role in analyses of meaning in trademark cases. A general corpus is a collection of texts that are sampled to be representative of a particular type of language variety. One of the most well-known in trademark cases (and other analyses of linguistic phenomena) is the Corpus of Contemporary American English (COCA). At the time of my report, COCA was comprised of 560 million words of American English from a range of genres – spoken, academic papers, newspapers, fiction

---

[1] These types of specialized corpus searches can be performed on various internet sites with data appropriate for each individual case, such LexisNexis which I did in App Store, and as I did in the present case through my review of consumer usage on industry websites, search engines, review sites, and blog entries.

writing, and magazines. As a representative corpus, COCA provides a range of information about many frequently used terms.

17.     In some cases, however, a term is not used frequently enough to be analyzed in this representative corpus of American English, and linguists then turn to or create specialized corpora to investigate meaning in more specific contexts. Given the extremely limited use of "overhead door" in COCA (a total of 31 hits in COCA, only 24 of which related in some manner to garage doors or garage door companies), I investigated additional specialized corpora to investigate consumer use of "overhead door" in more narrow contexts – those related to garage doors and garage door suppliers.

18.     Contrary to the suggestion made in Defendants' Motion, the creation and use of specialized corpora are not new phenomena, nor are they a new (or improper) method of examining meaning of a word or phrase. In fact, the creation of dictionaries stemmed from collections of individual words on slips of paper, documenting their origin, date of acquisition, meaning, and the context in which they were used. These "shoebox" corpora were the basis for some of the first English dictionaries such as the *Oxford English Dictionary*. These early corpora gave lexicographers observable evidence to provide more information about a word's origin, sense differentiation, and examples of use in context. Today, linguists still rely on dictionary evidence, but have much larger "databases" or

corpora of language from which to examine meaning – both in large, generalizable corpora such as COCA, and smaller, case-specific specialized corpora such as industry-specific consumer reviews and municipal codes referencing the term in question.

19.    In the current case, multiple corpora were examined in order to investigate the meaning and use of "overhead door" in as many contexts as possible. As in the majority of trademark cases, I began by examining COCA and then created (and/or directed the creation of) and analyzed smaller specialized collections of data – including, for example, consumer reviews, municipal codes, and pages from Aaron's own website – when not enough evidence was found in the large, representative Corpus of Contemporary American English (COCA) for the use of "overhead door".

**B.    Dictionaries**

20.    In this case, I was specifically interested in the use of OVERHEAD DOOR and OVERHEAD DOOR COMPANY OF ATLANTA in **American** English. For this reason, I examined the leading dictionaries of American English and found it important to my analysis that none of those dictionaries contained an entry for "overhead door," but they did contain entries for "garage door," what COCA demonstrated to be the more frequent term for the name of a door attached to a garage.

9

21.    Defendants' Motion suggests that I improperly ignored other dictionaries, such as Collins English Dictionary and three online dictionaries that list an entry – using virtually identical wording – for "overhead door" (Dictionary.com, The Free Dictionary and the Reverso Dictionary). But Collins is a dictionary of **British** English, and all three of these online dictionaries cite Collins, which indeed lists the term "in British," as the source for their definition. British English and American English are two different dialects with many systematic differences – viz. *lift/elevator*, *boot/trunk*, *bonnet/hood*, *car park/parking lot*, and innumerable other differences in words, grammar, and meanings. Thus, it was quite proper to discount the definitions in dictionaries based on British English, since this was not the relevant region to my analysis of use and understanding in metro Atlanta.

**C.    Google Trend Analysis**

22.    In addition to linguistic hierarchical analysis and dictionaries, evidence of actual consumer usage of the phrase "overhead door" is highly relevant, particularly with regard to assessing how or whether the phrase is commonly used or known in a generic sense. In my analysis, I reviewed numerous sources of consumer usage, including trade associations, consumer reviews of garage-door companies, consumer posts on competitor websites, including

Defendants' website, and Mr. Lucia's own usage on his blog. These are discussed in detail in my Expert Report.

23.     When I examined public sources of consumer and competitor usage, I found that the term "garage door" – and not "overhead door" – is the term in American English commonly used and known to refer to a door that is attached to the opening of a garage and rotates on a horizontal axis.

24.     In another effort to test this finding scientifically, I conducted an experiment using Google Trends, a free service that "analyzes a percentage of Google web searches to determine how many were done over a certain period of time" or within certain regions.[2] The nationwide Google Trends data *standing alone* do not tell us whether a term is being used in a generic sense or as a trademark, but they do serve a useful function in helping to assess the relative frequency of search terms within a category.

25.     First, I compared the terms "garage door," "overhead door," and "overhead garage door" in "All Categories" (e.g., autos and vehicles, business and industrial, home and garden) in the United States, and in Georgia, over the past 12 months. The search demonstrated that "garage door" is by far the commonly used term. (See Rpt page 16ff. Figures 5 (U.S.), 6 (Georgia), and 7 (Atlanta, GA)).

---

[2] https://trends.google.com/trends/?geo=US

26.     There were a few hits for "overhead door" in the nationwide search. I hypothesized that these might be fueled by the existence of authorized distributors of OVERHEAD DOOR brand products (like Plaintiff), and thus searchers were not searching for a *generic* type of product, but rather for products from a *particular source*. Put another way, if "overhead door" were in fact generic (i.e., was commonly used and known as the name of a product), the frequency of searches by consumers using the phrase "overhead door" in markets where there are **<u>no</u>** OVERHEAD DOOR-brand distributors should be similar to markets where there **<u>are</u>** OVERHEAD DOOR-brand distributors.

27.     To test this hypothesis, I examined the search patterns in markets where there are no OVERHEAD DOOR distributors,[3] and I found that in those markets, 100% of the searches are for "garage door," that is, Google Trends reported *no* searches for "overhead door" or "overhead garage door" – only "garage door." These data are reflected in my Expert Report in Figures 8-11.

28.     If, in fact, the phrase "overhead door" were the generic term (and there can be more than one generic term for a good or service such as in the opposition's examples: "couch" and "sofa"), the Google Trend data would not

---

[3] At the time I undertook my analysis, I understood that Laredo, Texas, and Alexandria, Louisiana, did not have OVERHEAD DOOR distributors. These markets were provided by counsel at my direction and I independently confirmed (through online searches) that no distributors operated in those cities.

materially differ between areas where OVERHEAD DOOR distributors exist and areas where they do not. The fact that *zero percent* of searches by consumers in areas without OVERHEAD DOOR distributors are for "overhead door" and instead *100%* are for "garage door" suggests that the relevant generic term for the genus of products is "garage door," not "overhead door."

29.    This distribution of data further suggested that "overhead door" may indeed be only used when the mark is *known* by the speakers of the region (i.e., as a result of having been exposed to the OVERHEAD DOOR trademark through advertising – for example as shown in the state of Georgia (Expert Report, Figures 6 & 7).

### D.    I Was Not "Spoon-Fed" By Counsel

30.    Defendants' Motion also asserts that I was "spoon-fed" certain information by counsel for Plaintiff. That is untrue and a gross mischaracterization of both my methodology and my practice as an expert witness.

31.    At the outset, it is worth noting that whenever I provide expert analysis in legal matters, I regularly evaluate evidence provided to me by counsel or whatever agency is seeking my expert opinion. For instance, when I do work on a criminal case with the police or the FBI, I certainly do not go to the crime scene and collect documents or other evidence myself; rather, I rely on the law enforcement officials or agents to have collected it and given it to me accurately. In

civil matters, I regularly ask counsel to provide me with various forms of evidence that are easier for counsel to collect, such as pleadings, relevant statutes or case law, documents that were exchanged by the parties during discovery, or page captures of large quantities of website evidence.

32.     As discussed above and in my Expert Report, I examined a wide variety of evidence during my analysis. I personally decided what categories of evidence to collect and review. And, where I thought it would be more efficient to have my research partner (and colleague at Hofstra, Professor Tammy Gales, Ph.D.) or counsel collect source material for my review, I provided specific instructions concerning what material I wanted to be collected and provided to me. None of the information I analyzed or reviewed was passively "spoon-fed" to me by counsel for Plaintiff.

33.     With regard to only two categories of information did I direct counsel for Plaintiff to do the source-material collection. First, for the extensive consumer reviews on various websites, I asked counsel to use its "Page Vault" software to capture those websites in a manner that would preserve identifying information such as the URL and the date of capture. Second, I wanted to review local ordinances in the metro Atlanta area, and after my research partner started reviewing City of Atlanta codes online, we determined it would be more efficient

(and less expensive) for a research assistant working for the law firm in Atlanta[4] to download the necessary ordinances from the wide range of websites listing each city or county's municipal codes. I therefore instructed them to visit those websites and send me any codes referencing "garage door(s)" or "overhead door(s)."

34.     After receiving the Page Vault captures of the consumer review webpages and the list of local ordinances, I, in collaboration with my research partner, carefully examined each finding and we also *revisited each original source* to ensure its accuracy before including the data in my Expert Report. For each source, including use by third parties within the relevant geographic region of the Atlanta metro area, use of "overhead door" and "garage door" were investigated.

## IV.   A Brief Discussion of Hyponymy in Relation to the Concept of Genericness

35.     In my Expert Report, I discussed the well-established linguistic concepts of hypernyms and hyponyms as a way of explaining one way I evaluated the terms at issue in this case through the linguistic investigative methods laid out in the previous section. There are many ways in which linguists investigate questions related to meaning. Some are through the hierarchical structures involving hyponymy; some are through the similar relationship of synonymy.

---

[4] It is my understanding that this exercise was completed by a summer research intern from Emory University, who was charging an hourly rate well below mine.

Defendants' Motion seems to completely misapprehend these kinds of semantic relations as well as the inferences linguists draw from them.

36.    Many linguists categorize meanings based on hierarchical structures with the *hypernym*, or superordinate term, being used most generally, or generically, to refer to the class of things that fall within its group. "Where the words being classified according to this relation are nouns, one can test for hyponymy by replacing X and Y in the frame 'X is a kind of Y' and seeing if the result makes sense. So we have '(A) horse is a kind of animal' but not '(An) animal is a kind of horse' and so on."[5]

37.    I did not suggest through my discussion of hyponymy, as implied in Defendants' Motion, that there can only be one generic term for a particular thing. Clearly, "sofa" and "couch," as adduced by Defendants, are both generic. But, significantly, they do not exhibit a hypernym/hyponym relationship. They exhibit a synonymous relationship, where both terms are generally accepted as a generic term for a particular thing.

38.    But what does exhibit a hypernym/hyponym relationship is "animal" and "dog."  If a creature is a dog, it is also an animal. But the two are not synonyms. Many animals are not, of course, dogs. Similarly, a "garage door" is a

---

[5] Ronnie Cann, "Sense Relations." Semantics: An International Handbook of Natural Language and Meaning, Vol. 1, ed. by Claudia Maienborn, Klaus von Heusinger, and Paul Portner. Walter de Gruyter, 2011

kind of "door," namely one that is attached to a garage; but not every door is a garage door.

39.     The linguistic evidence I evaluated in my Expert Report, and discussed in more detail above, did not show that "overhead door" is commonly used or understood as a synonym for "garage door." Rather, the data demonstrated that in the phrase "overhead door" the term "overhead" *describes* a feature of a door – whether it be in an airplane, a kitchen, or a garage. So some of the findings in a general corpus search in COCA, which will return all meanings of the phrase "overhead door," demonstrated that "overhead" described a kind of door that is "up-and-overhead," but not necessarily a synonym for a door that is attached to a garage. We likewise encountered references to "overhead garage door(s)," again showing that the term "overhead" was being used to *describe* a feature of a garage door – namely one that can go overhead.

40.     The argument against analyzing semantic relationships between terms is, again, misguided from a linguistic perspective. I agree that there are many examples of terms that can *both* be generic for a good or service – especially when they are acceptable synonyms like "couch" and "sofa." However, in instances where there is a hierarchical hyponym/hypernym relationship between terms, more analysis needs to be performed to investigate if speakers of American English use both terms in a generic manner to refer to the actual thing – in this case, a garage

door – or if they use one phrase as the superordinate one – garage door – and the other to *describe* a trait of *all* doors that go up-and-overhead – overhead door.

## V.  Analyses in Other Cases, Including "Pods" and "App Store"

41.    Defendants' Motion suggests that my methodology in this case was different from that in two prior cases, involving the words "pods" and APP STORE, and that because of those alleged differences, I am not following an accepted methodology. Defendants are wrong. The core methodology I followed in each case has remained consistent and follows generally accepted linguistic methods.

42.    Defendant's Motion manifests fundamental misunderstandings of science in general, and especially of the science of linguistics. Linguistics does not apply a cookie-cutter approach when attempting to understand the meaning of words or phrases. Like all sciences, we test hypotheses. Such hypotheses will be specifically applied to each case and relevant data-sets will be investigated in each case.

43.    As I explained above (and in my deposition), my methodology does not change from case to case. Rather, every case is different in that it presents a certain body of evidence that must be analyzed. In every case in which I have offered linguistic opinions concerning genericness, I have first considered the research questions related to each specific case, posed and tested hypotheses in

order to investigate those research questions, and investigated and analyzed data relevant to each individual case (including large, representative corpora and specialized corpora).

44.     During my deposition, I explained that although the *evidence* in each case differs, my *methodology* is consistently based on the science of linguistics:

> [T]hese cases all deal with linguistic analysis, so the first thing I do is bring to bear the science of linguistics and the evidence-based and fact-driven theories that I was taught in undergraduate, graduate and then advanced training and decide what linguistic issues are present and then draw up a plan of how to investigate that. (Dep. at p. 26.)

45.     When dealing with different data, one clearly does not blindly apply measures that will not lead to intelligent hypothesis testing. For example, while I will review COCA as a part of my methodology, *how* one evaluates the references in that corpus will depend on the volume of such references, the nature of the references in relation to the relevant genus of products or services, the representation of the relevant consumer in the corpus, the time frame being assessed, and the like.

46.     As I discussed above and in my Expert Report, COCA is not directed (or related whatsoever) to assessing usage by consumers of garage-door products or services, nor is it segmented by geographic locale or specific to metro Atlanta. Its "usefulness as a proxy" (to use Defendants' words) is therefore more limited in this case than it has been in cases where I am assessing a broader category of

usage or a broader geographic scope.

47.     In other words, data sets vary, even while the core methodology remains the same – hypothesis testing in a systematic way to examine linguistic variation or systematicity in a replicable manner.

48.     In the PODS case, for example, a COCA search showed over 1500 hits for "pod" and over 1300 hits for "pods," but not one branded use of PODS. The number of hits for "pod(s)" was large and unwieldy because the word "pod(s)" has many different meanings, making it difficult to find relevant uses. Conversely, in the APP STORE case, virtually every instance in databases of "app store," unless it was separated by a period (e.g., ". . . app. Store . . ."), was an instance of an online application marketplace and therefore relevant to the genericness of that phrase.

49.     Also, in the APP STORE case I was dealing with a closed set of data, that is, over a very specific time period, because the phrase at issue had not been in use for long. In that case, because the phrase was a newly coined term, I was able to determine and review the number of branded uses of APP STORE compared to the non-branded uses of APP STORE. In the PODS case, the data set that included all instances and meanings of "pod(s)" was not closed. Indeed, unlike the phrase APP STORE, the word "pod(s)" has been used for centuries and has numerous

meanings, many of which were not relevant to my analysis of "pod(s)" in the context of detachable containers for moving and storage services.

50.     As I explained in my report, a review of COCA shows references to "garage door(s)" 786 times, but only 31 references to "overhead door(s)," some of which related to airplane overhead bins or kitchen cabinets. A random sample of 100 of the 786 instances of "garage door(s)" showed that each one referred to doors that attach to personal or professional garages. In this case, the COCA data were important to my analysis insofar as they clearly demonstrated that "garage door" is the term commonly and consistently used as the name of a door that is attached to a garage, while the uses of "overhead door" were small in number and varied in meaning and context. These linguistic data demonstrate that the term "garage door" is the commonly used term for that particular genus of products – not "overhead door."[6]

_____

[6] Importantly, in APP STORE, there was no term analogous to the "garage door" term in this case. The hypothesis I was asked to test was whether most uses of "App Store" were generic, which I was able to disprove through an assessment of a wide variety of data. Because the total number of references in COCA was small, I combined my analysis of COCA with thousands of hits in Lexis. Were COCA's 33 hits of "App Store" the only data I discovered, I would not have been able to make a mathematically reliable "proportional" assessment of the hypothesis I was testing.

## VI.   Conclusion

51.    The methodology I employed in this case is entirely consistent with the scientific study of linguistics, a subject I have studied and taught for more than four decades. I carefully researched and analyzed a variety of corpora, dictionary evidence, and evidence of usage by actual consumers of garage-door products and services, using semantic concepts consistent with all linguistic analyses. Based on my experience and expertise as a linguist, and my analysis of the evidence in this case, I was and am still of the opinion that OVERHEAD DOOR COMPANY OF ATLANTA and OVERHEAD DOOR are not generic for garage doors or related services.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on:        April 9, 2020

Dr. Robert A. Leonard