# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**D. H. PACE COMPANY, INC. d/b/a**
**Overhead Door Company of Atlanta,**

      **Plaintiff,**

  **v.**

**AARON OVERHEAD DOOR**
**ATLANTA LLC, JEREMY RYAN**
**LUCIA, and STEPHENIE LUCIA,**

     **Defendants.**

**CIVIL ACTION FILE**

**NO. 1:17-CV-3430-MHC**

## <u>ORDER</u>

Plaintiff D.H. Pace Company, Inc. d/b/a Overhead Door Company of Atlanta ("Pace") brings this action based on allegations that Defendants Aaron Overhead Door Atlanta LLC ("Aaron"), Jeremy Ryan ("Ryan") Lucia, and Stephenie Lucia (collectively, "Defendants") have been operating a garage door business that uses a domain name, social media handles, and other words and phrases that are designed to mislead and confuse consumers into believing that Aaron is the same company or somehow affiliated with Pace.  Compl. [Doc. 1].

This case comes before the Court on Defendants' Motion to Exclude Putative Expert Robert Leonard ("Defs.' Mot. to Exclude Leonard") [Doc. 154],

Defendants' Motion to Exclude Putative Expert David Thomas Neal ("Defs.' Mot. to Exclude Neal") [Doc. 156], and Pace's Motion for Sanctions [Doc. 201].

## I.   BACKGROUND

### A.   Remaining Claims

Rather than repeating the factual background of the case, which has been stated in prior orders, the Court hereby incorporates the pertinent portion of the "Background" section from this Court's Order on the parties' motions for summary judgment.  Feb. 12, 2020, Order [Doc. 132] at 2-9.  Based on that order's dismissal of Counts VI and VII of Plaintiff's First Amended Complaint, the following claims remain in this case:  (1) unfair competition under the Lanham Act, 15 U.S.C. § 1125(a) (Count I); (2) deceptive trade practices under the Georgia Uniform Deceptive Trade Practices Act ("GUDTP"), O.C.G.A. § 10-1-372(a), (b)(2) (Count II); (3) unfair competition under OCGA § 23-2-55 and Georgia common law (Count III); (4) trademark infringement under Georgia common law (Count IV); (5) false or misleading advertising in violation of Section 43(a) of the Lanham Act and O.C.G.A. § 10-1-421 (Count V).  First Am. Compl. [Doc. 72] ¶¶ 42-52.

### B.   Pace's Experts

Pace offers the testimony of Robert Leonard ("Leonard") as evidence that the terms "Overhead Door" and "Overhead Door Company of Atlanta" as used in

the Atlanta area are not generic.  Expert Report of Robert Leonard, Ph.D (Aug. 10,

2018) ("Leonard Report") [Doc. 154-3] ¶ 12.  Pace also commissioned David

Thomas Neal ("Neal") to perform a likelihood of confusion survey of individuals

in the metropolitan Atlanta area and surrounding counties to determine if

Defendants' use of the trade name "Overhead Door" in connection with Aaron's

good and services was likely to cause consumer confusion.  Expert Report of

David Neal, Ph.D (Aug. 10, 2018) ("Neal Report") [Doc. 156-5].

## II.    LEGAL STANDARD

In federal court, federal law applies to the admissibility of expert testimony.

Flury v. Daimler Chrysler Corp., 427 F.3d 939, 944 (11th Cir. 2005) (holding that

in diversity cases, the Federal Rules of Evidence govern the admissibility of

evidence in federal court); see also Hendrix ex rel. G.P. v. Evenflo Co., 609 F.3d

1183, 1193 (11th Cir. 2010) ("Although the standards for finding causation are

governed by [state] law, we apply federal law to determine whether the expert

testimony proffered to prove causation is sufficiently reliable to submit it to the

jury.").  Federal Rule of Evidence 702 governs the admissibility of expert

testimony and provides:

> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or otherwise
> if:

3

> (a)    the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)    the testimony is based on sufficient facts or data;
> (c)    the testimony is the product of reliable principles and methods; and
> (d)    the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.  The Supreme Court has directed that

> [u]nlike an ordinary witness, see Rule 701, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation.  See Rules 702 and 703.  Presumably, this relaxation of the usual requirement of firsthand knowledge . . . is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline.

Daubert v. Merrell Dow Pharms., 509 U.S. 579, 592 (1993).

Because Rule 702 permits a broader range of testimony, the Supreme Court has made clear that district courts must perform a critical "gatekeeping" function concerning the admissibility of all expert testimony to ensure that an expert witness's testimony is not only relevant, but reliable.  United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 147 (1999); Daubert, 509 U.S. at 589 n.7, 597).  In particular, district courts are "charged with screening out experts whose methods are untrustworthy or whose expertise is irrelevant to the issue at hand."  Corwin v. Walt Disney Co., 475 F.3d 1239, 1250 (11th Cir. 2007).

4

In performing this gatekeeping function, the United States Court of Appeals for the Eleventh Circuit has developed "a rigorous three-part inquiry" to determine the admissibility of expert testimony under Rule 702, that considers whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

Frazier, 387 F.3d at 1260 (quoting City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998)). "While there is inevitably some overlap among the basic requirements—qualification, reliability, and helpfulness—they remain distinct concepts and the courts must take care not to conflate them." Id.

"A district court's gatekeeper role under Daubert 'is not intended to supplant the adversary system or the role of the jury.'" Maiz v. Virani, 253 F.3d 641, 666 (11th Cir. 2001) (quoting Allison v. McGhan, 184 F.3d 1300, 1311 (11th Cir. 1999)); accord Daubert, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); Adams v. Lab. Corp. of Am., 760 F.3d 1322, 1332, 1334 (11th Cir. 2014) (citations omitted) ("Bias in an expert witness's testimony is usually a credibility issue for the jury . . . . The risk of bias would mean, at most, that [the

5

expert's] testimony is to some extent 'shaky,' and shakiness goes to the weight of her testimony, not its admissibility."). Rather, the Court's role as a gatekeeper under <u>Daubert</u> "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." <u>Kumho Tire Co.</u>, 526 U.S. at 152.

The proponent of expert testimony "always bears the burden to show that his expert is qualified to testify competently regarding the matters he intended to address, the methodology by which the expert reached his conclusions is sufficiently reliable, and the testimony assists the trier of fact." <u>Frazier</u>, 387 F.3d at 1260 (quoting <u>McCorvey v. Baxter Healthcare Corp.</u>, 298 F.3d 1253, 1257 (11th Cir. 2002) (internal punctuation omitted)); <u>see also</u> <u>Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cnty.</u>, 402 F.3d 1092, 1107 (11th Cir. 2005) (explaining that it is the proponent's burden to lay the foundation for admission of expert testimony).

The Eleventh Circuit Court of Appeals has cautioned that "[m]any factors will bear on the inquiry, and [there is no] definitive checklist or test." <u>Maiz</u>, 253 F.3d at 665 (quoting <u>Daubert</u>, 509 U.S. at 593). <u>Daubert</u> and its progeny provide flexible guidelines for the admissibility of evidence under Rule 702, and "expert

testimony that does not meet all or most of the Daubert factors may sometimes be

admissible" based on the particular circumstances of a specific case.  United States

v. Brown, 415 F.3d 1257, 1268 (11th Cir. 2005); see also United States v. Scott,

403 F. App'x 392, 397 (11th Cir. 2010) (quoting Kumho Tire Co., 526 U.S. at 152)

(finding that the Daubert factors are only general guidelines and the trial judge has

"considerable leeway in deciding in a particular case how to go about determining

whether particular expert testimony is reliable"); Quiet Tech. DC-8, Inc. v. Hurel-

Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003) (finding that the court

should consider the Daubert factors "to the extent possible" but that "these factors

do not exhaust the universe of considerations that may bear on the reliability of a

given expert opinion, and a federal court should consider any additional factors

that may advance its Rule 702 analysis").

### A.    Qualification

There are various ways for determining whether an expert is qualified.

"While scientific training or education may provide possible means to qualify,

experience in a field may offer another path to expert status." Frazier, 387 F.3d at

1260-61.  Rule 702 provides that an expert's qualification may be based on

"knowledge, skill, experience, training, or education."  See also FED. R. EVID. 702

advisory committee's note (2000 amends.) ("Nothing in this amendment is

intended to suggest that experience alone . . . may not provide a sufficient foundation for expert testimony."). Thus, "there is no mechanical checklist for measuring whether an expert is qualified to offer opinion evidence in a particular field." Santos v. Posadas de P.R. Assocs., 452 F.3d 59, 63 (1st Cir. 2006).

## B.    Reliability

The district court has "substantial discretion in deciding how to test an expert's reliability and whether the expert's relevant testimony is reliable." United States v. Majors, 196 F.3d 1206, 1215 (11th Cir. 1999) (citation and quotation omitted). "[T]he proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable." Allison, 184 F.3d at 1312 (citation omitted). Thus, the inquiry into reliability must focus on "principles and methodology" and not the expert witness's conclusions. Daubert, 509 U.S. at 595. While an expert's qualifications may bear on the reliability of his proffered testimony, qualifications alone do not guarantee reliability. Frazier, 387 F.3d at 1261 (citing Quiet Tech. DC-8, 326 F.3d at 1341-42). Because "one may be considered an expert but still offer unreliable testimony," it remains a basic foundation for admissibility under Rule 702 and Daubert that proposed expert testimony must be based on "good grounds." Id.

Daubert delineates a list of "general observations" for determining whether expert testimony is sufficiently reliable to be admitted under Rule 702, including: (1) whether the theory in question can be and has been empirically tested; (2) whether the theory in question has been subjected to peer review and publication; (3) the theory's known or potential error rate and whether that rate is acceptable; and (4) whether the theory is generally accepted in the scientific community. Daubert, 509 U.S. at 593-594. The advisory committee notes for Rule 702 identify additional factors that courts consider in assessing the reliability of expert testimony:

> (1) Whether experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying.
> (2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion.
> (3) Whether the expert has adequately accounted for obvious alternative explanations.
> (4) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting.
> (5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

FED. R. EVID. 702 advisory committee's note (2000 amends.) (internal quotation marks and citations omitted).

> If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and

9

how that experience is reliably applied to the facts. The trial court's
gatekeeping function requires more than simply taking the expert's
word for it.

Frazier, 387 F.3d at 1261 (internal quotation omitted) (citing FED. R. EVID. 702

advisory committee's note (2000 amends.) (emphasis added)).

### C.   Helpfulness

Finally, the court must assess whether the expert testimony is helpful to the

trier of fact. This factor turns on whether the expert testimony "concerns matters

that are beyond the understanding of the average lay person." Id. at 1262.

"Proffered expert testimony generally will not help the trier of fact when it offers

nothing more than what lawyers for the parties can argue in closing arguments."

Id. at 1262-63.

### III.   ANALYSIS – MOTION TO EXCLUDE LEONARD

A central issue in this case is whether the terms "Overhead Door" and

"Overhead Door Company of Atlanta" are generic or descriptive. See Tana v.

Dantanna's, 611 F.3d 767, 774 (11th Cir. 2010) (citations omitted) (noting that

generic marks are generally incapable of receiving trademark protections, but

"[d]escriptive marks, though not inherently distinctive, may become sufficiently

distinctive to enjoy trademark protection by acquiring 'secondary meaning'").

Pace intends to rely on the expert testimony of Leonard as evidence that the terms

10

"Overhead Door" and "Overhead Door Company of Atlanta" as used in the Atlanta area are not generic.  Leonard Report ¶ 12.  Defendants have moved to exclude the testimony of Leonard arguing: (1) he is not qualified to offer his proposed opinions; (2) the factual foundation for his opinions is insufficient and unreliable; (3) his methodology is unreliable; and (4) his proposed opinions are irrelevant and lack "fit."  Defs.' Mem. of Law in Supp. of Mot. to Exclude Putative Expert Robert Leonard ("Br. to Exclude Leonard") [Doc. 154-1] at 14-35.

### A.    Qualification

Leonard is a professor of linguistics at Hofstra University where he is the director of the Forensic Linguistics graduate program.  Decl. of Dr. Robert Leonard (Apr. 9, 2020) ("Leonard Decl.") [Doc. 167] ¶ 3.  Leonard has a Ph.D. from Columbia University in theoretical semantics and sociolinguistics.  Id. ¶ 4. He has offered expert testimony in six federal district court cases, and at least one of those cases involved testimony regarding the generic nature of a trademark. Leonard Report ¶ 10.

Defendants argue that although Leonard is "a linguistic scientist," he is "not qualified as an expert in the subject matters of his proposed opinions" because "generic" is not a term used in the field of linguistics.  Br. to Exclude Leonard at 14-16.  Defendants appear to argue that even if Leonard were an expert, linguistics

11

is not an area of expertise that sheds any light on the genericism issue in this case.[1]
Id.  However, neither case relied upon by Defendants provides support for the
proposition that a non-lawyer linguistic scientist is not qualified to provide expert
testimony on the issue of whether a trade name is generic.  See S.E.C. v. Pasternak,
No. 05-3905 (JAP), 2008 WL 2281627, at *3 (D.N.J. May 29, 2008) (disqualifying
an expert who had "no particular expertise, knowledge, or experience in the nature
and type of trading that is the focal point of this action," namely, "the industry
practices of a wholesale market maker firm that principally trades high-volume,
highly-volatile stocks on the NASDAQ."); see also Martinez v. Rabbit Tanaka
Corp. Ltd., No. 04-61504-CIV, 2006 WL 5100536, at *12 (S.D. Fla. Jan. 6, 2006)
(holding that an expert "in the fields of real estate, condemnation, and personal
injury" was not qualified to provide an opinion "concerning lost profits flowing
from tortious interference with a start-up business" and that it was "not readily
apparent how Douglas' purported 'expertise' relates to the 'analysis' he provides in
this case").

Moreover, Defendants' argument that Leonard is not qualified is belied by
the fact that Leonard has previously testified in federal court as an expert in

---

[1] Defendants also argue that Leonard is not a lawyer, but they do not explain why
this disqualifies him as an expert in this case.  Id.

linguistics on the issue of generic trade names.  See Reinalt-Thomas Corp. v. Mavis Tire Supply, LLC, 391 F. Supp. 3d 1261, 1269 (N.D. Ga. 2019) (indicating that Leonard provided expert testimony that the phrase "discount tire" is not generic); PODS Enters., Inc. v. U-Haul Int'l, Inc., No. 8:12-CV-01479-T-27MAP, 2014 WL 12628664, at *1 (M.D. Fla. June 27, 2014) (noting that Leonard testified as an "expert in linguistics").  As Pace points out, in addition to the cases in which Leonard has testified as a linguistics expert on the issue of genericism in trade names, numerous courts have relied on the expert testimony of linguists in making genericism determinations.  See e.g., Donald F. Duncan, Inc. v. Royal Tops Mfg. Co., 343 F.2d 655, 660-62 (7th Cir. 1965) (relying on an expert linguist's testimony that supported holding that "yo-yo" was a generic term); Invisible Fence, Inc. v. Fido's Fence, Inc., No. 3:09-CV-25, 2014 WL 201457, at *4 (E.D. Tenn. Jan. 17, 2014) (denying a motion to exclude expert testimony, finding that the expert linguist's "specialized knowledge" would assist the trier of fact on the issue of genericness).

To qualify to testify as an expert, a witness must be able to testify competently regarding the matters he intends to address by virtue of his education, training, experience, knowledge, or skill.  See FED. R. EVID. 702.  The Court finds that Leonard's training and education in the field of linguistics, in addition to his

knowledge, skill, and experience testifying in legal matters regarding the generic

nature of trade names, qualifies him as an expert in this case.

**B.    Reliability**

Defendants argue that Leonard's opinions are unreliable because (1) his

case-specific methodology is unreliable and it fails to meet all of the guideposts

established by <u>Daubert</u> and its progeny and (2) the factual foundation for

Leonard's opinions is insufficient and unreliable.  Br. to Exclude Leonard at 16-31.

Pace disagrees, arguing that Dr. Leonard used sound, accepted linguistic methods.

Pl.'s Opp'n to Defs.' Mot. to Exclude Leonard ("Pace's Opp'n to Mot. to Exclude

Leonard") [Doc. 166] at 20-29.  Specifically, Pace contends that

> Dr. Leonard carefully and systematically applied established principles
> accepted in the field of linguistics to undertake a comprehensive
> linguistic analysis of the meaning and usage in American English (and,
> particularly, in Metro Atlanta) of the phrases OVERHEAD DOOR
> COMPANY OF ATLANTA and OVERHEAD DOOR.  Specifically,
> Dr. Leonard examined whether the linguistic evidence supported a
> straightforward hypothesis, namely: whether either of those terms is
> commonly used by the relevant public as the name of (i.e., to identify)
> a genus of products or services, or, rather to describe a feature of a
> product or service, or to identify who offers that product or service.

<u>Id.</u> at 21 (citing Leonard Decl. ¶¶ 10-11); <u>see also</u> <u>id.</u> at 26 ("Dr. Leonard evaluated

extensive evidence, including dictionaries, linguistic corpora, and a wide variety of

consumer and industry usage, before rendering his opinions.").  Leonard attempts

to explain his methodology: "[t]he methodology utilized in this case is generally

14

accepted by professional scientific linguists to analyze genericness (e.g., Shuy, 2002) and includes examining corpora, dictionaries, and other evidence of language use, as described in my Expert Report." Leonard Decl. ¶ 12.  Essentially, Pace and Leonard explain that his methodology is simply to examine various sources of information, or various databases, and then opine:

> Corpus analysis is an empirical approach to the study of language variation and use, which allows researchers to analyze large quantities of authentic language in order to reveal results with more generalizability and validity than would otherwise be possible.  The goals of corpus analysis are to examine patterns of variation with regard to meaning and to examine contexts that affect such variation.  For decades, corpus methods have been revolutionizing all branches of linguistics and, more recently, providing more scientifically-grounded insights into the study of language, especially in cases of trademark disputes.

> In particular, linguists have used and have encouraged the use of corpora (sometimes referred to as databases) and dictionaries for decades to investigate meaning in trademark cases.

Id. ¶¶ 14-15.  Leonard states that in cases like this involving linguistic analysis, he "bring[s] to bear the science of linguistics and the evidence-based and fact-driven theories that [he] was taught in undergraduate, graduate and then advanced training and decide[s] what linguistic issues are present and then draw[s] up a plan of how to investigate that." Dep. of Robert Leonard, Ph.D. (Aug. 28, 2018) ("Leonard Dep.") [Doc. 154-2] at 27.  Leonard assures that in this case his opinion is

not in any way based on who retains [him] or on any desired outcome; rather, it is based entirely on a professional linguistic testing of hypotheses and evaluation of the evidence that is appropriate in each particular case. Here, that body of evidence was extensive, and included corpora such as the Corpus of Contemporary American English (COCA), dictionaries of American English, and evidence of language use by the relevant public (i.e., consumers of garage-door products and services).

Leonard Decl. ¶ 13.

This Court's role as gatekeeper of expert testimony is to assess the reliability of a purported expert's methodology:

> While the inquiry is "a flexible one," the focus "must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 594-95; see McDowell v. Brown, 392 F.3d 1283, 1298 (11th Cir.2004) (recognizing a trial judge "should meticulously focus on the expert's principles and methodology, and not on the conclusions that they generate"). "But conclusions and methodology are not entirely distinct from one another"; neither Daubert nor Federal Rule of Evidence 702 requires a trial judge "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 137 (1997). Instead, the judge "is free to 'conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" Hendrix ex rel. G.P. v. Evenflo Co., Inc., 609 F.3d 1183, 1194 (11th Cir. 2010) (quoting Gen. Elec. Co., 522 U.S. at 146).
> \*\*\*
> As gatekeeper for the expert evidence presented to the jury, the judge "must do a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." Kilpatrick v. Breg, Inc., 613 F.3d 1329, 1335 (11th Cir. 2010) (citation and internal quotation marks omitted). It is "proper" and "necessary" for the trial judge "to focus on the reliability" of a proffered expert's "sources and methods." Id. at 1336. Under Daubert,

the "district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." Allison v. McGhan Med. Corp., 184 F.3d 1300, 1316-17 (11th Cir. 1999) (citation and internal quotation marks omitted).

Chapman v. Procter & Gamble Distrib., LLC, 766 F.3d 1296, 1305-06 (11th Cir. 2014). "[S]omething doesn't become 'scientific knowledge' just because it's uttered by a scientist; nor can an expert's self-serving assertion that his conclusions were 'derived by the scientific method' be deemed conclusive." McDowell v. Brown, 392 F.3d 1283, 1299 (11th Cir. 2004) (citation omitted).

Apart from explaining that his analysis involves examining relevant databases in ways that linguists have done "for decades" which provide "scientifically-grounded insights," neither Leonard or Pace offer any description or explanation of any uniform methodology used by Leonard as he examined the various databases. Pace would have this Court accept the proposition that Leonard's positing of a hypothetical question—whether "overhead door" or "overhead door of atlanta" is commonly used by the relevant public to identify a genus of products or services, or, rather to identify Pace, a company who offers that product or service— and his answering of that question based on his observations after consulting various databases is a methodology capable of

withstanding scrutiny under <u>Daubert</u>.  Neither Pace nor Leonard have identified a methodology, let alone one that is capable of analysis under <u>Daubert</u>.

<u>Daubert</u> delineates a list of "general observations" for determining whether expert testimony is sufficiently reliable to be admitted under Rule 702, including: (1) whether the theory in question can be and has been empirically tested; (2) whether the theory in question has been subjected to peer review and publication; (3) the theory's known or potential error rate and whether that rate is acceptable; and (4) whether the theory is generally accepted in the scientific community.  <u>Daubert</u>, 509 U.S. at 593-594.  Leonard's methodology, to the extent there is one, appears to entail his examination of various databases followed by him reaching some conclusions based on his observations.  This "methodology" does not appear to be testable, does not appear to be subject to peer review, does not appear to have been published, and Pace has presented no evidence that it is generally accepted in the scientific community.  Without any articulated methodology, Leonard's self-serving conclusions amount to nothing more than *ipse dixit* and this is insufficient to pass <u>Daubert</u>'s reliability prong.  <u>See</u> <u>Fed. Trade Comm'n v. Nat'l Urological Grp.</u>, No. 1:04-CV-3294-CAP, 2017 WL 6759868, at *41 (N.D. Ga. Oct. 10, 2017) (granting motion to exclude expert because "he failed to apply any reliable methodology in forming his opinions,

instead relying on his own *ipse dixit*"); <u>Butler v. First Acceptance Ins. Co.</u>, 652 F.

Supp. 2d 1264, 1272 (N.D. Ga. 2009) (citing <u>Gen. Elec. Co. v. Joiner</u>, 522 U.S.

136, 146 (1997)) ("An expert's opinion testimony becomes inadmissible, however,

where it is connected to existing data only by the ipse dixit of the expert."); <u>Eberli</u>

<u>v. Cirrus Design Corp.</u>, 615 F. Supp. 2d 1357, 1365 (S.D. Fla. 2009) (excluding

expert testimony where the purported expert did not use "any specific technique or

methodology").

To the extent Pace is relying solely on Leonard's qualifications and

experience, Pace has not provided a sufficient foundation for this Court to accept

Leonard's opinions as reliable; Pace has not explained how his experience leads to

his conclusions, why the experience is a sufficient basis for his opinions, and how

he applied that experience to the facts of this case.

> [W]hile an expert's overwhelming qualifications may bear on the
> reliability of his proffered testimony, they are by no means a guarantor
> of reliability.  Our caselaw plainly establishes that one may be
> considered an expert but still offer unreliable testimony.  Quite simply,
> under Rule 702, the reliability criterion remains a discrete, independent,
> and important requirement for admissibility.
>
> Indeed, the Committee Note to the 2000 Amendments of Rule 702
> expressly says that, "[i]f the witness is relying solely or primarily on
> experience, then the witness must explain how that experience leads to
> the conclusion reached, why that experience is a sufficient basis for the
> opinion, and how that experience is reliably applied to the facts. The
> trial court's gatekeeping function requires more than simply 'taking the
> expert's word for it.'"  Fed. R. Evid. 702 advisory committee's note

(2000 amends.); see also Daubert v. Merrell Dow Pharmaceuticals, Inc. (on remand), 43 F.3d 1311, 1316 (9th Cir.1995) (observing that the gatekeeping role requires a district court to make a reliability inquiry, and that "the expert's bald assurance of validity is not enough"). If admissibility could be established merely by the *ipse dixit* of an admittedly qualified expert, the reliability prong would be, for all practical purposes, subsumed by the qualification prong.

Frazier, 387 F.3d at 1261 (citation and alterations accepted).  Accordingly, because Pace has not identified a methodology used by Leonard in reaching the conclusions in his Report, the Court finds that Leonard's testimony is unreliable and precludes Pace from relying on it in this case.

### C.   Helpfulness

Even if the Court were inclined to accept Leonard's database review and observation as a reliable methodology that withstands scrutiny under Daubert, Leonard's conclusions do not answer the hypothetical he posits.  Leonard's Report purports to answer the following hypothetical: whether "overhead door" or "overhead door of atlanta" is "commonly used as the name of a genus of products or services or whether the primary significance of either of those terms is simply to identify a product or service, rather than to describe a feature of a product or service or to identify who offers that product or service."  Leonard Report ¶ 12.  However, Leonard's Report never answers this question.

20

Instead of making an assessment of whether "overhead door" is a generic

term, Leonard repeatedly provides conclusory observations that "garage door" is

"the" generic term (or the more frequently used generic term) to refer the genus of

products and services provided by Pace and Defendants.  See Leonard Report

¶¶ 15 ("Rather, it is my opinion that the generic term for the relevant genus of

products is 'garage door.'"), 17 ("Examinations of public resources in Atlanta, and

in the U.S. more broadly, demonstrate that 'door' or 'garage door' is the

commonly used term for a door that attaches to and provides entry into a garage, as

opposed to 'overhead door' being the commonly used term."), 36 ("Examinations

of public resources in Atlanta, and in the U.S. more broadly, demonstrate that the

term 'garage door' (or even simply 'door') is the commonly used term for a door

that attaches to and provides entry into a garage, even if the door moves up-and-

over one's head."), 41 ("The linguistic evidence suggests that even this descriptive

usage is rather rare, and the commonly used term for the relevant genus of products

is 'garage door.'"), 47 ("This suggests that the phrase 'overhead door' is not

commonly used to identify the relevant genus of products; rather, the term 'door'

or 'garage door' is the commonly used term."), 49 ("These popular home

improvement sites demonstrate that the more commonly used term - the one which

categorizes searches for 'overhead door' - is 'garage door.'"), 57 ("In short, the

21

dictionary evidence confirms that in American English, the phrase 'garage door' -
not 'overhead door' - is the commonly used term to identify a type of door that
covers the opening through which a car enters and leaves a garage."), 58 ("When I
examine public sources of consumer and competitor usage, it is clear that the term
'garage door' - and not 'overhead door' - is the commonly used term in American
English to refer to a door that is attached to the opening of a garage and rotates on
a horizontal axis."), 60 ("A comparison of the terms 'garage door,' 'overhead
door,' and 'overhead garage door' in All Categories ( e.g., autos and vehicles,
business and industrial, home and garden) in the United States and in Georgia over
the past 12 months demonstrates that 'garage door' is by far the commonly used
term."), 69 ("Thus, 'garage door' is much more common and always references a
door that is attached to a garage, whereas 'overhead door' is much less common
and has other additional meanings besides a door that attaches to a garage.  These
linguistic data demonstrate that the term 'garage door' is the commonly used term
for that particular genus of products - not 'overhead door.'"), 77 ("The evidence
from Defendants' website, both in terms of how Defendants communicate and how
Defendants' customers communicate, shows that the phrase 'garage door' is the
term commonly used to identify the genus of products - not 'overhead door.'"), 82
("Thus, city and county codes regulating doors that attach to garages refer to them

as 'garage doors' as the common term and not 'overhead doors.'"). In fact, Leonard even concludes by opining that "the" generic term "for the relevant genus of products is 'garage door.'" Id. ¶ 83.

Absent any argument or law suggesting that there can only be one generic phrase to refer to an item, Leonard's conclusion that "garage door" is a more frequently used generic term than "overhead door," or that "the generic term for the relevant genus of products is 'garage door,'" id., proves nothing in terms of whether "overhead door" is generic.[2] Leonard's conclusory opinions do not directly address the genericism of "overhead door." Accordingly, the Court finds that Leonard's opinion will not help the trier of fact assess whether "overhead door" is generic, and Defendants' Motion to Exclude Leonard is **GRANTED**.

---

[2] In fact, it appears that Leonard admits there is at least a "relatively sparse non-trademark [generic] use of 'overhead door'" which "can be seen in a variety of popular sources, including: Google Trends, The Corpus of Contemporary American English (COCA), Internet websites (webpage descriptions, blog postings, and customer reviews), [and] Municipal and county ordinances in the Metro Atlanta area." Leonard Report ¶ 17; see also id. ¶¶ 36 ("While there exists some limited use of the phrase 'overhead door' to describe a type of garage door (i.e., one that moves up-and-over one's head), the vast weight of the linguistic evidence leads me to conclude that the term 'overhead door' is not commonly used as the name for a genus of products and is, therefore, not generic."); 41 ("Occasionally, the term 'overhead' is used to describe a feature or characteristic of a garage door, for example, in the phrase 'overhead garage door.'").

## IV.   ANALYSIS – MOTION TO EXCLUDE NEAL

Pace commissioned Neal to perform a likelihood of confusion survey of likely purchasers of garage door products and services in the metropolitan Atlanta area and surrounding counties.  Neal Report.  Specifically, Neal

> designed and executed a likelihood of confusion survey with a total of 262 respondents.   [Neal's] survey followed a well-established methodology and its purpose was to objectively establish, using scientifically valid and reliable methods, whether likely purchasers of garage door products and services in the relevant counties in Georgia are likely to be confused specifically because of the types of Google advertisements Defendants have used to attract customers.

Id. ¶ 1.1. (p. 3).  Defendants argue that the Neal Report is inadmissible because (1) the survey population he used had the wrong geographic scope, and the individuals he surveyed were not properly vetted; (2) his opinions are irrelevant because his survey was not designed to provide a measurement of confusion; and (3) there is too great an analytical gap between his survey data and the opinions he extrapolated therefrom.  Defs.' Mem. of Law in Supp. of Mot. to Exclude Putative Expert Neal ("Br. to Exclude Neal") [Doc. 157-1] at 13-25.  The Court will address Defendants' arguments seriatim.

### A.   Neal's Survey Population

In assessing the reliability and relevance of survey evidence, the Court must determine whether the "universe" was properly defined. Citizens Fin. Group, Inc. v. Citizens Nat'l Bank of Evans City, 383 F.3d 110, 118–19 (3rd Cir. 2004) (citing 2 McCarthy § 32:159).  The universe is

that segment of the population whose perceptions and state of mind are relevant to the issues in the case. Id. "Even if the proper questions are asked in a proper manner, if the wrong persons are asked, the results are likely to be irrelevant." McCarthy § 32:159; see Citizens Fin. Group, 383 F.3d at 119.

Atlanta Allergy & Asthma Clinic, P.A. v. Allergy & Asthma of Atlanta, LLC, 685

F. Supp. 2d 1360, 1373 (N.D. Ga. 2010).

Defendants first argue that the Neal Report is inadmissible because Neal's

survey included people from nine Atlanta-area counties where Pace is not licensed

to use ODC's Overhead Door Company of Atlanta tradename and the survey is not

relevant to the extent he considered those counties. Id. at 14-15. Defendants

explain that the relevant survey universe begins with Defendants' consumer base,

but then should be limited to include only those individuals who reside in

Defendants' consumer base and who also reside in counties that overlap with

Pace's licensed rights to use the relevant marks. See Defs.' Reply in Supp. of Mot.

to Exclude Neal ("Defs.' Reply") [Doc. 182-1] at 5-7.

"The appropriate universe should include a fair sampling of those purchasers

most likely to partake of the alleged infringer's goods or services." Amstar Corp.

v. Domino's Pizza, Inc., 615 F.2d 252, 264 (5th Cir. 1980);[3] see also 6 McCarthy

on Trademarks and Unfair Competition § 32:159 (5th ed.) ("The universe is that

segment of the population whose perceptions and state of mind are relevant to the

issues in this case."). In this case, the appropriate survey universe is potential

purchasers of Defendants' goods and services and those likely to encounter

Defendants' allegedly infringing advertising, including individuals the Atlanta-area

counties considered in Neal's survey. Assuming *arguendo* that respondents were

excluded from the nine Atlanta-area counties where Pace is not licensed, by

Defendants own math, 73% of the counties represented in Neal's survey were

statistically relevant. See Br. to Exclude Neal at 14-15 (noting that the nine

counties erroneously included represented 27% of the total counties).

     Moreover, Neal's review of his survey results reveals that, when limited to

the universe of counties Defendants deem appropriate, there is no meaningful

statistical difference. Compare Suppl. Expert Report of David Neal Ph.D. (Oct. 5,

2018) ("Suppl. Neal Report") [Doc. 156-9] ¶ 2.10.1 (concluding that there was a

net confusion level of 23% in the original Expert Report with 262 respondents

---

[3] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc),
the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth
Circuit handed down before October 1, 1981.

drawn from 47 counties in the Greater Atlanta Area); with ¶ 2.10.2 (concluding

that there was a net confusion level of 18% when Neal restricted the analysis to the

155 respondents who live in one of the Atlanta-area counties in which Pace is

authorized to use the Overhead Door Company of Atlanta tradename).

Additionally, Neal opines that it was not erroneous to include Atlanta-area counties

where Pace was not licensed because these are counties where likely consumers

still may have encountered Defendants' mark:

> [C]ounties in which the Defendants have successfully made sales to
> date cannot be assumed to be the only counties in which likely
> consumers might encounter the Defendants' mark.   Indeed,
> [Defendants' expert] admits that only "95%" of Defendants'
> advertising occurs in the 7 counties she identifies.   In addition, I
> understand that, for a variety of reasons (e.g., accuracy of geo-targeted
> ads and searches on smartphones), Google advertising campaigns
> cannot be restricted exclusively to those who physically reside in a
> specific county.   For example, a large share of search behavior is now
> conducted via smartphone, and many consumers may live in one county
> but use their smartphone to search for goods and services in another
> county (e.g., when they are at work, at a café, at a store, etc.).

Suppl. Neal Report ¶ 2.7.3.

In addition, Defendants have failed to support their position that the

inclusion of individuals from Atlanta-area counties in which Pace is not authorized

to use the Overhead Door Company of Atlanta tradename results in an incorrect

survey universe.   The cases relied upon by Defendants do not support the

proposition that an individual respondent who resides in a county where Pace is

authorized to use the ODC tradenames would be a relevant survey respondent while an individual who resides in an adjacent county would not be.  See, e.g., Hi Ltd. P'ship v. Winghouse of Fla., Inc., 6:03CV116ORL22JGG, 2004 WL 5486964, at *8 (M.D. Fla. Oct. 5, 2004) ("The failure to include a single female in the survey, when women comprise nearly a third of Hooters' customer base and perhaps even more of Winghouse's clientele, reflects a patently flawed methodology striking at the very heart of the survey's validity.").  Unlike Winghouse, there is no inappropriate exclusion or inclusion of survey respondents that affect Neal's survey results.  If anything, the inclusion of Atlanta-area consumers who reside in counties in which Pace is not authorized to use the ODC tradenames is a technical deficiency which goes to the survey's weight, not its admissibility.  See Jellibeans, Inc. v. Skating Clubs of Georgia, Inc., 716 F.2d 833, 845 (11th Cir. 1983) (finding survey evidence probative, notwithstanding its technical deficiencies).

Second, Defendants argue that Neal did not limit the population of those surveyed to individuals who intended to purchase a garage door on the internet. Br. to Exclude Neal at 15-17.  Defendants rely exclusively on 1-800 Contacts, Inc. v. Lens.com, Inc., No. 2:07-CV-591 CW, 2010 WL 5186393, at *6 (D. Utah Dec. 15, 2010), for the proposition that Neal's universe was improperly over-inclusive

28

because it was not limited to individuals who were likely to use Google as a search engine to search for garage doors.  In <u>1-800 Contacts</u>, the court found that a survey universe that was not limited to individuals likely to use the internet to make a purchase was over-inclusive:

> Only those who have purchased or are likely to purchase contacts on the Internet would see Lens.com's sponsored link in the actual market. Accordingly, that was the relevant universe.  Yet, the survey questions did not limit respondents only to those who purchased contacts on the Internet.   The court therefore concludes that Degen used an over-inclusive universe.

<u>1-800 Contacts, Inc.</u>, 2010 WL 5186393, at *6.  The court excluded the consumer-confusion survey based on this design flaw, among others.  <u>Id.</u> at *8 (holding that the plaintiff failed to meet its burden that the survey was admissible because, among other things, there was no "ability to determine which respondents had actually used or would use the Internet to purchase contact lenses."  <u>Id.</u>

Similarly, because Neal failed to ask respondents if they had used or were likely to use the internet to search for overhead garage door products or services by conducting a Google search, Defendants argue that the Neal survey should be excluded.  Br. to Exclude Neal at 15-18.  Defendants point out that Pace's own marketing materials indicate that the likelihood of advertising over the internet varies across different demographics.  <u>Id.</u> at 18-19 (citing, *inter alia*, Pace's marketing material).

29

Pace downplays the significance of the lack of screening questions involving the use of the internet or Google as a search engine. Pace explains that the record evidence demonstrates that Defendants primarily do their advertising on Google and Pew data indicates that "basically everyone" searches for goods and services on the internet and "Google's market share is extraordinarily high." Pl.'s Opp'n to Defs.' Mot. to Exclude Neal ("Pl.'s Opp'n to Neal Exclusion") [Doc. 169] at 17 (quoting Dep. Tr. of David Thomas Neal, PhD (Sept. 25, 2018) ("Neal Dep.") [Doc. 156-8] at 106, 122-23). Pace also emphasizes that (1) the respondents in Neal's survey were invited to participate via email, and (2) the survey was conducted on the internet. Id. at 17-18 n.17. Pace contends this assures that the respondents were using a computer, tablet or smartphone and likely used the internet to shop for goods and services. Id. The Court finds that the failure of Neal's survey to include a screening question regarding the likelihood of the respondents to use the internet is a technical deficiency which goes to the survey's weight, not its admissibility. See Jellibeans, 716 F.2d at 845.

Third, Defendants argue that Neal did not limit the survey universe by factors such as age, income, home value, and the age of the home. Br. to Exclude Neal at 18-19. Defendants point to Pace's marketing materials that indicate that different segments of the population receive information from different media

30

which confirms that some segments get information from print or radio advertising, not the internet.  Id.  For example, Defendants argue that the survey included fifty-seven people over the age of sixty-five and Pace's marketing materials indicate that those individuals were more likely to be receptive to print advertising.  Id.

Pace responds by arguing that Neal's screening question asked if the respondent had or was likely to purchase garage door products or services in the two years preceding and following the survey and there was no need to exclude respondents older than sixty-five.  Pl.'s Opp'n to Neal Exclusion at 18-19; Questionnaire [Doc. 156-6] ¶¶ 2, 7-8.  Pace contends that it would have been error to limit the questionnaire to individuals under sixty-five because it would have erroneously excluded potential purchasers of Defendants' garage door products or services.  Id. (citing Superior Consulting Servs., Inc. v. Shaklee Corp., No. 6-16-CV-2001-ORL-31GJK, 2018 WL 2087239, at *5 (M.D. Fla. May 4, 2018) ("It would have been improper to limit the survey respondents by age when Superior's own customers are not so limited. . . . The age of the respondents in the survey universe does not render Poret's survey unreliable under Rule 702.")).

The Court agrees with Pace that Neal's inclusion of individuals over the age of sixty-five in the survey results does not render the survey unreliable under Rule 702.

### B.    Neal's Survey Design

Neal's survey tests the discrete issue of whether consumers are likely to be confused by Defendants' Google advertisement:



Pl.'s Opp'n to Neal Exclusion at 19.  To test the likelihood of confusion, Neal employed a "two room Squirt survey."[4]  Neal first showed respondents the following screenshot of Pace's website:



---

[4] This format was named after the case in which it was first accepted.  <u>SquirtCo v. Seven-Up Co.</u>, 628 F.2d 1086 (8th Cir. 1980).

Id. at 5.  Then, Neal presented respondents with four randomly ordered Google advertisements (one beings Defendants' advertisement above, and the other three listings from three unrelated companies):

Commercial Garage Doors - The Best Prices in Atlanta - aaofga.com
[Ad] www.aaofga.com/ ▾   (770) 800-5972
Free Replacement Estimates, BBB A+ Repair Services & Replacement Doors
Family Owned Since 1987 · Two Atlanta Locations! · BBB A+ Rated
Commercial Garage Doors · Contact Us

Elite Overhead Garage Doors - Residential/Commercial Repair
[Ad] www.eliteoverheadgarage.com/service/repairs ▾
100% Satisfaction Guarantee. On Time & Courteous Technicians. Call Us Today!

Overhead Door - 5 Star Rated Service - aaronoverheaddoors.com
[Ad] www.aaronoverheaddoors.com/ ▾
We Can Help You Choose The Best Color & Style For Your Home. Call Aaron Today!

Atlanta Garage Door Service - $200-Off New Garage Doors
[Ad] www.fivestargaragedoorrepair.com/Garage/Atlanta ▾   (678) 786-2904
Affordable Garage Door Repair in Your Neighborhood - Same Day Service Available
Book Appointment Online · Open 5am - midnight · Daily Coupons & Discounts
Garage Door Openers · New Garage Doors · Garage Door Repair · Book Appointment Now

Id. at 6.  Respondents were then queried whether they believed any of the four listings (1) would take them to the website they first saw or (2) were affiliated with, or sponsored or approved by, the company whose website they had previously seen and, if so, which ones and why.  Id. (citing Neal Report ¶¶ 3.11-3.21).

Defendants argue that the design of Neal's survey does not measure the likelihood of confusion with the tradename "Overhead Door Company of Atlanta" and is instead a test of recency or the possibility that a respondent was confused by

33

the phrase "overhead door." Br. to Exclude Neal at 19-24. First, Defendants argue that the respondents were not given the context of the survey demonstratives, i.e., they were not told anything about what search terms had been entered to generate the list of four Google search results and they were not told for what purpose they should consider those search results. Id. at 20-23. Second, Defendants argue that the screenshot of Pace's website contains the term "overhead door" in three separate places which results in a test of that mark instead of "Overhead Door Company of Atlanta." Id. at 24 (quoting Pace's Resp. to Defs.' Statement of Add'l Material Facts [Doc. 123-1] ¶ 24 ("The only mark Pace is seeking to enforce is OVERHEAD DOOR COMPANY OF ATLANTA, and in determining protectability, the only mark at issue is OVERHEAD DOOR COMPANY OF ATLANTA. The fact that a court in 1933 found "over head door" to be "descriptive" is not material to the protectability of Pace's mark in the Greater Atlanta Area today.")). Because the Neal survey results do not measure the likelihood of confusion between Defendants' advertising and "Overhead Door of Atlanta," Defendants argue that it lacks fit and should be excluded. Id. at 19-24.

Defendants cite to Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's Found. of Am., Inc., 307 F. Supp. 3d 260, 278 (S.D.N.Y. 2018), as an illustration of a two-stage survey that Defendants argue is more appropriate in this

34

case. Id. at 21-22.  Although Alzheimer's Found. involved a Squirt-style survey,

the survey design was not challenged in that case.  See Alzheimer's Found., 307 F.

Supp. 3d 260; see also Br. to Exclude Neal at 21 n.8 (acknowledging that the

Squirt-style survey design in Alzheimer's Found. was not challenged).  Defendants

do not argue that Squirt-style two-room surveys are not generally accepted.  Nor

do Defendants contest Pace's position that Neal's survey followed this generally

accepted Squirt-style survey.  Nor do any of the cases cited by Defendants question

the validity or uphold the exclusion of a Squirt-style survey.  See Br. to Exclude

Neal at 23 (citing Frosty Treats Inc. v. Sony Comput. Entm't Am. Inc., 426 F.3d

1001, 1010 (8th Cir. 2005); Malletier v. Dooney & Bourke, Inc., 561 F. Supp. 2d

368, 386 (S.D.N.Y. 2008) (analyzing the likelihood of confusion in a case that did

not involve any survey); Jacobs v. Int'l Multifoods Corp., 668 F.2d 1234, 1236

(C.C.P.A. 1982) (analyzing the likelihood of confusion in a case that did not

involve any survey).[5]

---

[5] The cases cited in Defendants Reply brief also are inapposite.  See Defs.' Reply
at 11-13 (citing Universal Church, Inc. v. Universal Life Church/ULC Monastery,
No. 14 CIV. 5213 (NRB), 2017 WL 3669625, at *13 (S.D.N.Y. Aug. 8, 2017),
aff'd sub nom., Universal Church, Inc. v. Toellner, 752 F. App'x 67 (2d Cir. 2018)
(finding a "survey of limited value since the survey takers were simply told that
they were searching for a generic entity named 'The Universal Church,' without
any attempt to measure whether the survey takers associated such an entity with
plaintiff"); Water Pik, Inc. v. Med-Sys., Inc., No. 10-CV-01221-PAB-CBS, 2012
WL 2153162, at *11 (D. Colo. June 13, 2012) (finding no clear error of law in

Pace asserts that using the screenshot from its actual website as it is seen in the marketplace in Neal's survey was appropriate in this case and that it would have been error to just present the words "Overhead Door Company of Atlanta" on a blank screen. Pl.'s Opp'n to Neal Exclusion at 20-21 (citing Shaklee Corp., No. 6-16-CV-2001-ORL-31GJK, 2018 WL 2087239, at *3-5 (finding a two-room Squirt survey using website screenshots to be probative evidence of confusion, but excluding a survey that failed to show a disputed mark as it appeared in the market). Further, Pace contends that had Neal disclosed to the survey respondents that the list of four randomly ordered Google advertisements resulted from a search

---

declining to consider a survey that had "an overinclusive survey universe, an unrepresentative sample, replicates unrepresentative market conditions, and contains suggestive questions"); Instant Media, Inc. v. Microsoft Corp., No. C 07-02639 SBA, 2007 WL 2318948, at *14 (N.D. Cal. Aug. 13, 2007) (excluding a dissimilar survey that "was poorly designed, to the point of being laughable."); Simon Prop. Grp. L.P. v. mySimon, Inc., 104 F. Supp. 2d 1033, 1043 (S.D. Ind. 2000) (excluding survey because, among many other reasons, "[t]he survey does not ask respondent to view actual search engine results containing hyperlinks to these sites in a way that might actually occur in the marketplace"); Starter Corp. v. Converse, Inc., 170 F.3d 286, 297 (2d Cir. 1999) (affirming trial court's exclusion of a survey that was found to be irrelevant because it did not test or demonstrate likelihood of consumer confusion); Beneficial Corp. v. Beneficial Capital Corp., 529 F. Supp. 445, 450–51 (S.D.N.Y. 1982) (finding that a survey that was based on a leading question, with a high percentage of respondents indicating no confusion and which was found to be not "a survey of consumer reaction to the products under actual market conditions" did not constitute meaningful evidence of actual confusion)).

for "overhead door," the respondents would have been too focused on that phrase and it may have resulted in a survey indicating a higher level of net confusion.

To the extent Neal's survey was not designed in a manner preferred by Defendants does not mean it is not probative of confusion. Once again, to the extent there are flaws in the survey design, they go to the survey's weight, not its admissibility. See Jellibeans, 716 F.2d at 845.

**C.    Individual Respondent Opinions**

Defendants' final argument is that Neal did not account for the fact that some survey participants indicated that they did not understand the import of the study and thought that they were being asked to select the advertisement that appealed to them the most, or some other irrelevant inquiry, or that they just guessed. Br. to Exclude Neal at 24-25. However, the Court agrees with Pace that Neal's failure to include the respondents' answers to open-ended questions into his quantitative analysis was not inappropriate. Neal explains that his approach is consistent with what is generally accepted in the scientific community:

Q:    Do you have a methodology as to how to deal with people that say it's just a guess?

A:    That -- so the bigger issue to me is like verbatim, open-ended questions and how reliable are they, and the general rule -- and I always do this at the start -- is that people are often pretty bad at explaining why they made a decision, and so I include these open-ended questions because they give you some qualitative flavor for people's thinking,

and it's, also -- you know, typically when these surveys are constructed, they include these kind of open-ended probes.  I don't use them really quantitatively, and most experts that I'm aware of don't do that either. So if someone, for example, was to say, oh, I'm guessing, that doesn't -- that doesn't mean it's an invalid response necessarily, right, because someone could find two marks to be confusingly similar, but they may not be able to put their finger on exactly why that is.  So they're responding to an intuition that the two things feel confusingly similar to each other.  Then, when you poke at them and say, well, tell me why, they can't really give you a coherent explanation for it.  So on its face if someone was to say I'm guessing, that by itself would not probably be a basis for excluding them.  As I understand it, legally someone doesn't need to know why they're confused.  They just need to be confused.

Neal Dep. at 118-19.  Neal's decision not to include the survey participants' individual responses in his quantitative analysis goes to the survey's weight, not its admissibility.  Defendants will be able to challenge Neal's testimony with any of the survey participants' individual responses at trial.

Consequently, Defendants' Motion to Exclude Neal's Testimony is

**DENIED**.

**V.     ANALYSIS – MOTION FOR SANCTIONS**

On June 30, 2020, Pace filed a Notice of Supplemental Authority which attached an opinion from the Supreme Court and in several pages of legal argument, explained its relevance "to the genericness issues to be presented at trial, as well as to the pending Motion to Exclude Dr. Robert Leonard."  Pace's Notice of Suppl. Authority [Doc. 197] (attaching United States Patent & Trademark

Office v. Booking.com B. V., 140 S. Ct. 2298, 207 L. Ed. 2d 738 (2020)).

Defendants filed a response to Pace's notice, which also included several pages of

argument explaining Defendants' position on the Booking.com opinion and

attaching multiple exhibits.  Defs.' Resp. to Pace's Notice of Suppl. Authority

("Defs.' Resp. to Pace's Suppl. Authority") [Doc. 198].  Pace did not seek leave of

Court to file the Notice of Supplemental Authority and Defendants did not seek

leave to file their response.  In its Motion for Sanctions, Pace asserts that

Defendants' Response to Pace's Supplemental Authority goes beyond responding

to the notice and provides additional argument and evidence in support of their

Motion to Exclude the Testimony of Leonard in violation of this Court's previous

Order limiting Defendants to thirty-five pages of argument in support of their

motion to exclude.  Pace's Mot. for Sanctions [Doc. 201] (citing March 16, 2020

Order [Doc. 149]).

Pursuant to Federal Rule of Civil Procedure 16, a court may impose

sanctions for, *inter alia*, failure to obey a scheduling or other pretrial order.  FED.

R. CIV. P. 16(f).  Rule 16 sanctions may include an award of the reasonable

expenses caused by the misconduct, including attorney's fees.  FED. R. CIV. P.

16(f)(2).  In addition, the Local Rules permit this Court to sanction attorneys for

misconduct in multiple ways, including by imposing monetary penalties.

LR 83.1F, NDGa ("Nothing in this rule limits the inherent authority of a judge to manage individual assigned cases, including the authority to impose monetary penalties, disqualify counsel, and impose any other appropriate penalties or sanctions; and nothing in this rule imposes additional procedural requirements before a judge may exercise that authority.").

The Court does not find anything related to Pace's filing of the Notice of Supplemental Authority or Defendants' response thereto to be sanctionable. Accordingly, Pace's Mot. for Sanctions is **DENIED**.

## VI.   CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendants' Motion to Exclude Putative Expert Robert Leonard [Doc. 154], is **GRANTED**.

It is further **ORDERED** that Defendants' Motion to Exclude Putative Expert David Thomas Neal [Doc. 156] and Pace's Motion for Sanctions [Doc. 201] are **DENIED**.

**IT IS SO ORDERED** this 2nd day of March, 2021.

MARK H. COHEN
United States District Judge

40